[Civ. No. 33146. First Dist., Div. Two. Mar. 12, 1975.]

PAT MONTANDON, Plaintiff and Respondent, v.
TRIANGLE PUBLICATIONS, INC., Defendant and Appellant.

## COUNSEL

Cooper, White & Cooper, James L. Brosnahan and Neil L. Shapiro for Defendant and Appellant.

Charles O. Morgan, Jr., for Plaintiff and Respondent.

## OPINION

**BRAY, J.*—**Defendant appeals from judgment of the San Francisco Superior Court after a jury verdict in favor of plaintiff.

### QUESTIONS PRESENTED

1. The article was libelous.

2. There was proof of malice.

3. Civil Code section 48a does not apply to magazines.

### RECORD

Plaintiff filed an action against defendant Triangle Publication, Inc. (hereinafter "Triangle"), the owner and publisher of TV Guide for libel

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

by reason of an insertion hereinafter described appearing in that publication of September 14, 1968.

Defendant answered denying liability and setting up certain affirmative defenses. A first trial by jury resulted in a mistrial as the jury failed to reach a verdict.[1] Thereafter a jury rendered a verdict in favor of plaintiff and against Triangle in the sum of $150,000 compensatory damages and $1,000 punitive damages. Triangle appeals.

FACTS

This litigation arose because in the TV Guide available for sale at newsstands on September 9, 1968, there appeared the listing for the "Pat Michaels Show" scheduled to be seen on September 20, 1968, hereinafter discussed.

It is unnecessary to detail the evidence showing that Miss Montandon is a public figure and a person of general newsworthiness. Plaintiff has never claimed otherwise. In September of 1968 "How to Be a Party Girl," a book which plaintiff had authored about party giving, was about to be released to the public. To promote the book her publicity agent arranged for plaintiff to appear on a number of television and radio programs, including the Pat Michaels show. Unbeknownst to both the agent and Miss Montandon, the producer and the host of the show decided to have an anonymous prostitute on the show with Miss Montandon. This information was not conveyed to the latter.

To publicize the show the producer wrote the following release and sent it to the various media for publication, including TV Guide: "FRIDAY, SEPTEMBER 20TH, 10:30 P.M., 'PAT MICHAELS SHOW', [¶] 'FROM PARTY-GIRL TO CALL-GIRL?" [¶] How far can the 'party-girl' go until she becomes a 'call-girl' is discussed with T-V personality Pat Montandon, author, ('How to be a Party-Girl') and a masked-anonymous prostitute!"

The employee of TV Guide in charge of writing that material for the publication changed the release, which was her usual practice. The

---

[1]Cox Broadcasting Company, a corporation, John Armstrong and Pat Michaels were joined as defendants. During the trial Armstrong's motion for nonsuit was granted. The motions of Pat Michaels and Cox Broadcasting for directed verdicts were granted and judgment entered in their favor. Plaintiff appealed from that judgment, which is being considered simultaneously herewith in *Montandon* v. *Cox Broadcasting Corp.. ante.* page 932 [120 Cal.Rptr. 196].

article as rewritten by Jane Young stated: "10:30 [2] *Pat Michaels-Discussion* [¶] [Color] 'From Party Girl to Call Girl.' Scheduled guest: TV Personality Pat Montandon and author of 'How to Be a Party Girl' discusses her book."

However, the copy as ultimately printed by TV Guide did not have in it "discusses her book." Thus the article as finally written read: "10:30 [2] *Pat Michaels-Discussion* [¶] [Color] 'From Party Girl to Call Girl.' Scheduled guest: TV Personality Pat Montandon and author of 'How to Be a Party Girl.' "

This article was published in TV Guide's special issue, the "Fall Preview," which had a paid circulation of 800,000 and a complimentary issue of 20,000 copies distributed primarily in the Bay Area and the central parts of California.

The editor of the Northern California edition of TV Guide was Tom Dorsaneo. Dorsaneo had several programmers working for him, each of whom had specific television stations assigned to her and would prepare the copy coming in from her assigned stations. On Thursday of the week in question, programmer Jane Young received a press release from KTVU-TV, Channel 2, containing promotional descriptions of five different television programs. It included the press release written by the producer of the Pat Michaels Show quoted above.

Jane Young rewrote the press release as before stated. She testified that after rewriting the release, she believed that she forwarded it to Dorsaneo for approval, as this was her usual practice. Although the news release had not contained the phrase "discusses her book," she added those words on the assumption that any author appearing on a television discussion program would at least briefly discuss her book. Mrs. Young also testified that her deletion of any reference to the masked, anonymous prostitute was, to her, not significant because it was the ordinary procedure in talk-discussion shows not to list all guests. She also stated that one reason she eliminated the reference was because she did not want to use the word "prostitute" in TV Guide.

It was Dorsaneo's responsibility to check all copy before it went to the printers and also to see that the copy contained no untrue statements. Dorsaneo testified that he believed he deleted a phrase from the rewritten program note, but was not sure if the phrase which he deleted was "discusses her book." He stated that if anyone had deleted the phrase, it would have been he.

Mrs. Young and Dorsaneo testified that the program note was again checked or proofread at the printing plant on Friday night.

Dorsaneo testified that part of his job with TV Guide was to look for defamatory material and make certain that someone was not characterized as a call girl. He stated that at the time he reviewed it, he interpreted the program note to mean that Channel 2 was going to have its usual Pat Michaels Show; that the guest would be Pat Montandon; and that the discussion topic would be "From Party Girl to Call Girl."

He testified it was his experience that when a person was listed who was going to talk on a subject, the reader assumed that person had some experience or knowledge of the subject. He said that his understanding of the program note was that Pat Montandon would be talking about "From Party Girl to Call Girl" (meaning going from a party girl to a call girl), and because of the book which she had written, she would be discussing that aspect of the topic which concerned the "party girl." He assumed that the readers would interpret the note in the same manner.

Dorsaneo testified that when he received the program note he did not interpret it to mean plaintiff had gone from a party girl to a call girl and he did not feel that the note said or implied that Miss Montandon was a call girl. Nor at the time he testified did he feel that the average reader would think the program note as printed in TV Guide called the plaintiff a call girl.

The program note as published was substantially different from the release. The deletion of a question mark caused "From Party Girl to Call Girl" to become a statement, as opposed to a question. And, deletion of any reference to the masked anonymous prostitute implied that plaintiff would be the only guest on the show to discuss the topic. This is not a case where the magazine personnel could have been mistaken about the true facts, as the true facts were plainly stated in the Channel 2 release.

The very nature of the discussion topic-caption "From Party Girl to Call Girl [?]" should and must have alerted Young and Dorsaneo to be wary of possible libel by incorrectly labeling or implying that someone was a call girl. Both Young and Dorsaneo testified that they did not interpret, nor did they believe the average reader would interpret, the published program note as relating the plaintiff to a call girl or labeling her as a call girl. This testimony flies in the face of reason, as a reading of the program note reveals.

The action by the TV Guide staff showed a reckless disregard of whether the statement published was true or false, because the staff was aware that the true facts, as stated in the press release, were that Pat Montandon was not a call girl but would be appearing on a show with a call girl; and a staff decision was made to leave out crucial facts in rewriting the release, thereby implying that plaintiff was a call girl. This is proof of convincing clarity to support the jury's verdict that the article was published not in good faith, but with actual malice.

1. *The article was libelous.*

■ Professor Arthur E. Hutson, Professor Emeritus of English from University of California, Berkeley, testified that in his opinion the average reader would conclude from the article that Miss Montandon had progressed from being a party girl to being a call girl, with party girl meaning a girl who likes to give and go to parties and a call girl being a prostitute. No contrary expert evidence was introduced. There was evidence of other similar interpretations of the article by a newspaper society editor, a bank vice president, two producers in the television industry and a young fan of plaintiff. Miss Montandon, because of the article, did not appear for the TV show and it never took place.

Both Jane Young, the programmer who originally rewrote the Channel 2 news release, and Tom Dorsaneo, the TV Guide regional editor, agreed that the discussion topic "From Party Girl to Call Girl" meant how far a party girl could go before she became a call girl, and that Miss Montandon was the only listed guest. The news release was changed so substantially by Triangle as to radically change its meaning.

TV Guide did not truthfully report the press release from Channel 2. TV Guide, through its employees, decided not to tell the public that another guest was to be on the show to discuss the subject. This was done knowingly and not because of any space problems. No adequate reason was given for the omission. Both of the involved employees of TV Guide acknowledged that, as written by them, the article conveyed the impression that Miss Montandon was to be the only guest to discuss the subject of "how far can a party girl go before she becomes a call girl." This could be considered a knowing falsity on the part of TV Guide. No reasonable explanation, excuse or justification was given. The evidence disclosed that the average person would necessarily conclude that Miss Montandon had experience on the subject. The TV Guide employees admitted that they did not have any information as to whether the lady

had that kind of experience; hence, it was reasonable for the jury to find, which it obviously did, that the publication of this statement was a reckless disregard of the truth or falsity of the statement, which is libel.

"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) It cannot be gainsaid, and the evidence strongly shows, that this published writing exposed the subject to hatred, contempt, ridicule and obloquy.

The instant case has similarities to *Time, Inc.* v. *Ragano* (5th Cir. 1970) 427 F.2d 219, a libel case in which the defendant, Time, Inc., appealed from the denial of a motion for summary judgment. The basis of the alleged defamation was a picture and article which appeared in the "People" section of Time magazine. The picture showed seven men seated at a restaurant table, and the article referred to the gathering as a meeting of thirteen "top Cosa Nostra hoodlums" and referred to three of the men in the picture by name "plus ten other bigwigs."

Actually, the picture was taken during a break in grand jury proceedings and two of the seven men pictured were attorneys who represented one or more of the alleged "hoodlums" with whom they were sitting. Although the Time staff knew that the two were attorneys, no mention was made of this fact in the article. Ragano was one of the pictured attorneys and sued Time, Inc., claiming that the article and picture defamed him because of the clear implication that he was a top Cosa Nostra hoodlum.

In seeking summary judgment, and on appeal from denial of the motion, Time asserted there was nothing in the record from which it could be said that plaintiff Ragano could show malice with the convincing clarity required of him. As to this claim, the court said: "We disagree. The record, which consists of affidavits, exhibits and depositions, shows that all of the *Time* staff knew that Ragano was an attorney from the 'bio' files Time, Inc., had on him. The first draft of the article referred to the two lawyers as 'mouthpieces.' However, this indication that plaintiff was an attorney was deleted during the editorial process. Time, Inc., nevertheless contends that there was no malice on its part because Ragano participated in the second luncheon along with the others as a gesture of disdain for the law; since he participated with the

others, *Time* was entitled to come to the good faith belief that he could 'be journalistically considered a hoodlum.' [¶] In view of the principle that all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion for summary/ judgment, *e. g.,* United States v. Diebold, Inc., 1962, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176; Gross v. Southern Ry. Co., 5 Cir. 1969, 414 F.2d 292, and in light of the fact that all the Time, Inc., employees knew that Ragano was an attorney, we think that a genuine issue of material fact exists as to whether *Time's* conclusion that Ragano could journalistically be referred to as a top Cosa Nostra hoodlum was made in good faith or with malice. Therefore, summary judgment was properly denied. Fed.R.Civ.P. 56(c)." (*Time, Inc.* v. *Ragano, supra,* 427 F.2d 219, 221.) The denial of the motion for summary judgment was affirmed.

Appellant proved that Miss Montandon was a public figure at the time of the publication and as such the rule in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], applies,—that in order for a public official to recover damages for a defamatory falsehood relating to his official conduct, he must prove that the statement was made with actual malice; that is, with knowledge that it was false or with reckless disregard of whether or not it was false. (*New York Times Co., supra,* pp. 279-280 [11 L.Ed.2d pp. 706-707].) This rule as we will hereinafter discuss, has been extended to public figures, which are defined in *Cepeda* v. *Cowles Magazines and Broadcasting, Inc.,* (9th Cir. 1968) 392 F.2d 417, 419 (cert. den. 393 U.S. 840 [21 L.Ed.2d 110, 89 S.Ct. 117]): " 'Public figures' are those persons who, though not public officials, are 'involved in issues in which the public has a justified and important interest.' Such figures are, of course, numerous and include artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done."

*2. There was proof of malice.*

█ We now consider whether there was substantial evidence of malice by Triangle Publications in publishing the libelous article. The jury found that there was, as the judge in instructing the jury, while not using the word "malice," used its definition, saying that the plaintiff had to prove the statement was published with the knowledge that it was false or with reckless disregard for its truth or falsity by clear and convincing evidence.

Prior to 1964 when the United States Supreme Court in *New York*

*Times Co.* v. *Sullivan, supra,* page 254, changed it, the rule in libel cases was one of strict tort liability of one who defamed another in a statement to a third party. In *New York Times Co.* v. *Sullivan, supra,* pp. 279-280 [11 L.Ed.2d pp. 706-707], the court stated: "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

In *Garrison* v. *Louisiana* (1964) 379 U.S. 64, 74 [13 L.Ed.2d 125, 132-133, 85 S.Ct. 209], the Supreme Court further defined the *New York Times* meaning of actual malice by stating: "And since '. . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive" . . .,' 376 U.S., at 271-272, *only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions.*" [Italics added.] At the same time the court made it clear that the reckless-disregard-of-truth standard is not the same as the reasonable-belief standard: "*The reasonable-belief standard applied by the trial judge is not the same as the reckless-disregard-of-truth standard.* According to the trial court's opinion, a reasonable belief is one which 'an ordinarily prudent man might be able to assign a just and fair reason for'; the suggestion is that under this test the immunity from criminal responsibility in the absence of ill-will disappears on proof that the exercise of ordinary care would have revealed that the statement was false. *The test which we laid down in New York Times is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth.*" (*Garrison* v. *Louisiana, supra,* p. 79 [13 L.Ed.2d p. 135].) [Italics added.]

In *St. Amant* v. *Thompson* (1968) 390 U.S. 727 [20 L.Ed.2d 262, 88 S.Ct. 1323], the court expanded on the standard of actual malice, stating that while the phrase "reckless disregard" of whether a statement is false or not cannot be fully encompassed in one infallible definition and inevitably its outer limits will be marked out through case-by-case adjudication, nevertheless, the cases are: "clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.* Publishing

with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." (*St. Amant* v. *Thompson, supra,* p. 731 [20 L.Ed.2d p. 267].) [Italics added.] The court went on to further state: "The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (*St. Amant* v. *Thompson, supra,* p. 732 [20 L.Ed.2d pp. 267-268].)

Subsequently this requirement of actual malice was extended to libel actions brought by public figures and by persons involved in matters of public interest or concern. (*Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 155 [18 L.Ed.2d 1094, 1111, 87 S.Ct. 1975] (rehg. den. 389 U.S. 889 [19 L.Ed.2d 197, 88 S.Ct. 11]); *Rosenbloom* v. *Metromedia* (1971) 403 U.S. 29, 43-44 [29 L.Ed.2d 296, 311-312, 91 S.Ct. 1811]; *Garrison* v. *Louisiana, supra,* pp. 74-75 [13 L.Ed.2d pp. 132-133]; *Belli* v. *Curtis Pub. Co.* (1972) 25 Cal.App.3d 384, 388 [102 Cal.Rptr. 122].)

The average person reading the article as published reasonably would conclude that Miss Montandon's knowledge of the subject "From Party Girl to Call Girl" was because she had experienced that progress herself. Anyone participating in the publication of the article did so with reckless disregard of whether Miss Montandon had had that experience or had not.

Reviewing the evidence as we are required to do (*New York Times Co.* v. *Sullivan, supra,* pp. 254, 285 [11 L.Ed.2d pp. 686, 709]; *Belli* v. *Curtis Pub. Co., supra,* pp. 384, 389), we find that the principles required in a libel action by a public figure were constitutionally applied, and that the verdict is substantially supported.

The persons responsible for the publication of the article testified that in the alteration of the article as originally submitted, they followed the usual practice of the magazine and had no intention of indicating to the

public that Miss Montandon might be a call girl. However, it is not the elimination of any portion of the original article in itself which gave plaintiff the cause of action, but it was the article which resulted. Leaving the article without something more than the brief statement which remained, resulted in the false impression of Miss Montandon's status. While this result was apparently not intentional, it was one which those responsible should have foreseen and one which showed a reckless disregard for the truth or falsity of the statement. The conduct of those responsible for the publication was more than negligence, it amounted to an indifference to the impression being given to the general public.

There is no basis whatever for appellant's suggestion at argument that the jury could find that Michaels wrote the original article intending that TV Guide should change it into the form which it did.

3. *Civil Code section 48a does not apply to magazines.*

This section limits the recovery in an action for damages for publication of a libel in a newspaper to special damages, as there defined, unless the plaintiff serves upon the publisher, within 20 days after knowledge of publication, a written notice specifying the statements claimed to be libelous and demanding that the article be corrected. Plaintiff made such a demand, but after the 20 days specified in the statute. The demand was made on the 23d day after plaintiff learned of the publication.

TV Guide within 20 days after the publication of the article, and before plaintiff demanded retraction, published a "clarification" which read: "The September 14, 1968 issue of TV Guide listed the Pat Michaels Show which was scheduled for last Friday, September 20, 1968 at 10:30 P.M. on channel 2, as featuring a discussion on the subject of 'From Party Girl to Call Girl.' [¶] The listing did not state that one of the scheduled guests would be an anonymous masked woman, formerly a prostitute. We were informed that the other guest, Miss Pat Montandon, a well known television personality, cancelled her appearance on the program because of the description given in TV GUIDE. [¶] This magazine wishes to make clear to its readers that the description of the program did not apply to Miss Montandon in any way but referred merely to the scope of the discussion with Miss Montandon and the masked woman."

The trial court ruled that section 48a did not apply to magazines

and that TV Guide was a magazine and not a newspaper. It refused to instruct that the jury should determine whether or not TV Guide was, in fact, a newspaper. The court also refused to instruct that plaintiff did not give the notice specified by section 48a and that plaintiff's recovery should, therefore, be limited to special damages. The court did instruct, as requested by defendant, that the clarification could be considered in mitigation of damages, provided said clarification was full and unequivocal. Defendant claims error, contending that section 48a is applicable and that the jury should have been instructed as to that section.

In *Morris* v. *National Federation of the Blind* (1961) 192 Cal.App.2d 162, 166 [13 Cal.Rptr. 336], the court held that section 48a did not apply to magazines: "On full review of the statute, we conclude that it [section 48a] applies only to a publication in a newspaper or by radio. Its terms are clear. The Legislature conspicuously failed to include magazines in the protected group. We are bound by this apparently intended omission. Extension of the statute requires amendment rather than interpretation. Since the only allegation is that respondent's publication is a magazine, the necessity of demand for correction does not appear on the face of the complaint and the demurrer cannot be sustained on this ground."

The court stated further: "It may be noted that the exculpatory effect of a retraction is limited to one published within three weeks of demand therefor, a requirement which would often be impossible of fulfillment by a magazine published monthly." (*Morris, supra,* pp. 165-166.)

The court pointed out that up to that time no California decision had specifically determined whether or not the statute applied to magazines. It referred to the fact that in *Harris* v. *Curtis Publishing Co.* (1942) 49 Cal.App.2d 340 [121 P.2d 761], although the court "assumed application of section 48a to magazines, it does not discuss the point, which apparently was not raised by the briefs" and that *Shumate* v. *Johnson Publishing Co.* (1956) 139 Cal.App.2d 121 [293 P.2d 531], "implies that the statute does not extend to magazines." (*Morris, supra,* p. 165.)

In *Cameron* v. *Wernick* (1967) 251 Cal.App.2d 890, 892 [60 Cal.Rptr. 102], a libel action brought against the publisher of the Saturday Evening Post, the court, in a footnote, stated that section 48a, did not apply to magazine articles, although no issue concerning that section was before it.

In *Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121 [216

P.2d 825, 13 A.L.R.2d 252], a major contention on appeal was that section 48a violated the equal protection clauses of the United States and California Constitutions in granting retraction privileges to newspapers and radio stations *only*. Both the majority and the two dissenting members of the court indicated that they were of the opinion that the Legislature intended that the statute apply only to newspapers and radio stations.

In *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1], an action against the publisher of Reader's Digest for invasion of plaintiff's right of privacy by publishing the fact that some 11 years prior to the publication he had hijacked a truck and fought a gun battle with police, the trial court sustained without leave to amend a demurrer to the complaint. The Supreme Court reversed, holding that the complaint did state a cause of action for invasion of privacy by publication of plaintiff's name in the article. The court stated further that allegations in the complaint were not sufficient to state a "false light" cause of action, one which is in substance equivalent to a libel claim, because the plaintiff had not complied with the requirements of section 48a.

As *Briscoe* involved not a newspaper but a magazine, it would appear that the court was holding that section 48a applies to a magazine as well as a newspaper. Unfortunately, no discussion appears therein of the cases which hold that the section does not apply to magazines. Nor is there any discussion of the reasons upon which the holding is based, particularly the reason as stated in *Morris, supra,* pages 165-166: "that the exculpatory effect of a retraction is limited to one published within three weeks of demand therefor, a requirement which would often be impossible of fulfillment by a magazine published monthly." Although in the case at bench the magazine, TV Guide, is published weekly and could comply with a demand for retraction within the statutory period, it is obvious that the statute which completely ignores all magazines could not be construed to apply to certain magazines and not to others. Likewise, consideration was not given in *Briscoe* to the further discussion in *Morris, supra,* page 165, which referred to the fact that "our Supreme Court, in holding the statute constitutional, has noted the interest of the public in the free dissemination of news *(Werner . . .)*. Particular emphasis was placed upon the pressures upon media of news dissemination for publishing 'news while it is new,' and the resultant limitation of time and opportunity for ascertaining the complete accuracy of all items printed." Moreover, the court in *Briscoe* cited as the only support for its

holding, *Werner, supra,* and *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20 [81 Cal.Rptr. 360, 459 P.2d 912], both of which were libel actions against newspapers and contained no discussion of the application of section 48a to magazines.

Section 48a was originally adopted in 1931 (Stats. 1931, ch. 1018, p. 2034, § 1) and applied only to newspapers. It was amended in 1945 (Stats. 1945, ch. 1489, p. 2763, § 5) to add radio. The statute on its face applied only to " 'a newspaper' and radio broadcast." It is significant in light of the decision in *Morris, supra,* in 1961 that the section did not apply to magazines, that the Legislature has not amended it to include magazines. It is also significant that the Legislature in 1949 provided in section 48.5 of the Civil Code that the term "radio broadcast" as used in part 2 of the code is "defined to include both visual and sound radio broadcasting." If, as defendant claims, the Legislature intended to include magazines it has had abundant opportunity to do so.

In *Briscoe, supra,* page 543, the court said: "We do not hold today that plaintiff must prevail in his action. It is for the trier of fact to determine (1) whether plaintiff had become a rehabilitated member of society, (2) whether identifying him as a former criminal would be highly offensive and injurious to the reasonable man, (3) whether defendant published this information with a reckless disregard for its offensiveness, and (4) whether any independent justification for printing plaintiff's identity existed. *We hold today only that, as pleaded, plaintiff has stated a valid cause of action, sustaining the demurrer to plaintiff's complaint was improper, and that the ensuing judgment must therefore be reversed.*" [Italics added.] In view of the court's statement limiting its opinion to a matter of pleading and the other matters above stated, *Briscoe* cannot be considered as authority for overruling the determination in *Morris, supra,* page 162, that section 48a does not apply to magazines.

*Johnson* v. *Harcourt, Brace, Jovanovich, Inc.* (1974) 43 Cal.App.3d 880 [118 Cal.Rptr. 370], is an action for invasion of the plaintiff's right of privacy by republication of an article from The Nation magazine in a college English textbook. Judgment of the trial court sustaining the defendant's demurrer without leave to amend was affirmed. In the opinion reference is made to *Kapellas, supra,* page 20, and in *Briscoe, supra,* page 529, to the California Supreme Court's determination that a false light action is in substance equivalent to a defamation suit and that a plaintiff alleging false light, therefore, must also satisfy the requirements of malice and demand for retraction within 20 days of notice of

the publication, citing Civil Code section 48a the court stated: "Although *Briscoe* extended the coverage of section 48a to encompass magazines, under the conclusion we here reach we do not determine whether the retraction requirement extends to the publication of books." *(Johnson, supra,* p. 894.)

As we have pointed out hereinbefore, we do not consider *Briscoe* as authority for the proposition that section 48a applies to magazines, nor do we consider that the mere reference in *Johnson, supra,* page 880, to section 48a adds anything to the issue, particularly as the court refused to go into the application of section 48a to books and the question of its application to magazines was not before the court.

Defendant contends that the court should have given the jury its proposed instruction that the jury determine as a matter of fact whether TV Guide is a magazine or a newspaper. That determination is one of law to be made by the court. As the publication calls itself a magazine and its regional manager for Northern California testified that it called itself America's Television Magazine, the court did not err in making the determination that it is a magazine, and in refusing to give the proferred instructions.

Judgment affirmed.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied April 1, 1975, and appellant's petition for a hearing by the Supreme Court was denied May 8, 1975. Mosk, J., did not participate therein. Tobriner, J., was of the opinion that the petition should be granted.