[Civ. No. 60302. Second Dist., Div. Three. Oct. 6, 1981.]

HERITAGE PUBLISHING COMPANY, Plaintiff and Respondent, v. LAUREL MAE CUMMINS, as Executor, etc., et al., Defendants and Appellants.

## COUNSEL

Caidin, Kalman, Sampson & Marpet, Stanley Caidin and Newton Kalman for Defendants and Appellants.

Gordon, Weinberg & Gordon and Arnold G. Regardie for Plaintiff and Respondent.

---

OPINION

**COBEY, Acting P. J.**—Defendants, Joseph J. Cummins and B'nai B'rith Messenger, a California corporation (hereafter Messenger), appeal from a judgment upon a jury verdict, as reduced upon the conditional denial of a motion for new trial, of $25,000 in general damages and $50,000 in punitive damages in favor of plaintiff, Heritage Publishing Company (hereafter Heritage), in a libel action between the two Jewish weekly newspapers, both headquartered here in Los Angeles.[1]

We intend to reverse this judgment for failure to prove federal constitutional actual malice.[2]

## FACTS

The Messenger contained a rather lengthy article in its July 19, 1974, issue, appearing under the byline of its editor, defendant Cummins, and headlined "Will Kramer Attempts To Justify Heritage Claim—'Published Since 1914,' There Was No Southwestern Jewish Review Ever Published in San Diego," and "The Kramer Balderdash Can't Evade The Facts That The '1914' Claim Is False." It referred to an earlier article appearing in the Messenger of January 25, 1963, on the same subject, headlined "Southland History Should Not Be Perverted," in which was published a letter from Rabbi Trattner, who had been rabbi of Temple Beth Israel in San Diego during 1920 and 1921, stating that "there was no Southwestern Jewish Review nor did I ever hear of such a paper" and a statement of Rabbi Dubin, who continued the publication of the Temple Bulletin, which Rabbi Trattner had founded, that this was the only Jewish newspaper published in San Diego from 1921

---

[1]Defendant Cummins died subsequent to the filing of the notice of appeal herein and the executrix of his estate, Laurel Mae Cummins, has been substituted in his place as a defendant herein.

[2]We surmise that the nine-to-three jury verdict here for Heritage was probably due in large part to the overwhelming proof of actual malice in the traditional sense on the part of defendant Cummins toward Heritage that Heritage offered. The jury was instructed upon both types of actual malice. On the record before us, defendant Cummins was an extremely abrasive competitor who tried repeatedly, before the 1974 article in the Messenger, which occasioned this lawsuit, to eliminate competition by Heritage through questionable tactics, to say the least. Furthermore, one of the headlines in the article itself was proved to be inaccurate.

to 1925 and that the Southwestern Jewish Press was not published in San Diego during that period of time. These were the two Jewish newspapers mentioned as predecessors of Heritage in Rabbi Kramer's article in Heritage which was reproduced in the 1974 article in the Messenger.

The 1974 article in the Messenger mentioned also a statement of another former rabbi of Temple Beth Israel, Rabbi Cohn, that a newspaper known as the Southwest Jewish Press had been founded only a few years before 1946. The article further stated that the telephone company in San Diego had advised the Messenger that the July 1940 listing of the Southwest Jewish Press was the first Jewish newspaper to be listed in any of its directories and that the city directory of San Diego did not contain a listing of a Jewish newspaper before 1941.

As already noted, the 1974 article mentioned the 1963 article on the same subject. This earlier article also stated that the American Jewish Year Books of 1912 through 1913 and 1916 through 1917 did not list any San Diego Jewish publication nor did the telephone and city directories of 1914. Finally, the 1974 article pointed out that a Mrs. Nathan F. Baranov, who had been a resident of San Diego for many years prior to 1914, had stated that when her late father, a prominent citizen of San Diego, died in 1916 his obituary was carried only in the San Diego Union and that, in her opinion, if any Jewish newspaper had then existed in San Diego, the obituary would have been published there. The article therefore called the listing in the Universal Jewish Encyclopedia of the Southwestern Jewish Review as a weekly founded in San Diego in 1914 "a slovenly error" and Heritage's claim that Heritage—Southwest Jewish Press—had been published since 1914 "a damnable lie."

The 1974 article, which defendant Cummins admittedly wrote, contained other hyperbole as well. It characterized Rabbi Kramer's article in Heritage as a "monumental hunk of hogwash," that "takes the cake for 'historical' unadulterated bunkum." It called Heritage's masthead statement "Published Since 1914" a damnable lie and accused Heritage of a "program of mendacity" in this respect.

Heritage was first published in February 1954. In August 1958 it acquired the Southwestern Jewish Press of San Diego from the Maxwell Kaufmans. This newspaper apparently started in February 1940 under the name of San Diego Jewish Press, but it had earlier been known as the "Southwestern Jewish Review," which had been adjudicated a newspaper of general circulation in November 1934 and had apparently

originated in 1923.[3] The masthead of its April 1936 issue states that it incorporates "The Jewish Community News." Billings for all four Heritage publications apparently carried on their mastheads the words "Serving California Since 1914."

## DISCUSSION

In the leading case of *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706, 84 S.Ct. 710, 95 A.L.R. 2d 1412], the United States Supreme Court enunciated the federal constitutional requirement (Amends. I, XIV) that a public official could not recover damages for a defamatory falsehood relating to his official conduct unless he proved that the falsehood was made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." In *Garrison* v. *Louisiana* (1964) 379 U.S. 64, 74 [13 L.Ed.2d 125, 133, 85 S.Ct. 209], the same court a few months later interpreted the just-quoted language as meaning that civil liability in defamation attaches in such a situation only for "those false statements made with [a] high degree of awareness of their probable falsity." A few years later in *St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323], the high court restated this constitutional requirement for liability for such defamation thusly: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication" and also said that in such a situation "[t]he finder of fact must determine whether the publication was indeed made in good faith." (*Id.* at p. 732 [20 L.Ed.2d at p. 267].)

Although it would appear that plaintiff Heritage is at most a public figure (but obviously not a public official (see *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 154-155 [18 L.Ed.2d 1094, 1111, 87 S.Ct. 1975]),[4] and not a private individual (see *Gertz* v. *Welch* (1974) 418 U.S. 323, 325 [41 L.Ed.2d 789, 797, 94 S.Ct. 2997], Heritage expressly conceded both in the trial court and in its brief to this court that the *New York Times*' constitutional requirement of actual malice applies herein and, of course, the jury was so instructed.

We have examined, as is our duty (see *Bindrim* v. *Mitchell* (1979) 92 Cal.App.3d 61, 72 [155 Cal.Rptr. 29]; *Montandon* v. *Triangle Publications* (1975) 45 Cal.App.3d 938, 948 [120 Cal.Rptr.

[3]The name of the Southwestern Jewish Review was not formally changed to Southwest Jewish Press until May 1959.

[4]Under *Curtis* a public figure may recover damages for a defamatory falsehood by showing "highly unreasonable conduct constituting an extreme departure from the

186, 84 A.L.R.3d 1234]), the evidence in support of the jury's verdict for Heritage impliedly finding the falsity of the article of July 19, 1974, that defendant Cummins and the Messenger published, accusing Heritage of lying in claiming that it had been published since 1914, and have concluded that such evidence is neither clear nor convincing (see *Gertz* v. *Welch, supra*, 418 U.S. at p. 342 [41 L.Ed.2d at p. 807]; *Rollenhagen* v. *City of Orange* (1981) 116 Cal.App.3d 414, 421 [172 Cal.Rptr. 49]) in establishing that Cummins wrote the article either knowing that its basic accusation was untrue or in reckless disregard of whether it was true or false or with serious doubts regarding its truth.[5]

As noted at the outset of this opinion, the article itself contained some internal evidence of some prior preparatory investigation by its author and publisher of the factual basis for the otherwise libelous accusation it made against Heritage. We refer to the statements of Rabbis Trattner, Dubin and Cohn mentioned in the article and its indication of some investigation of the telephone and city directories of San Diego and of the American Jewish Year Books. Finally, the article mentioned the specific basis for Mrs. Baranov's conclusion that there was no Jewish newspaper in existence in San Diego in 1916. According to a letter that Rabbi Cohn wrote defendant Cummins about two weeks before the 1974 article was published, she had personally so advised him.

Gilbert Thompson, the associate editor and copublisher of the Messenger at the time of the trial of this case, detailed in his testimony much of the factual investigation that was made in the preparation of the 1974 article in the Messenger. His testimony was based on notes that he and defendant Cummins made during the last week of June 1974. According to Thompson's testimony, defendant Cummins, in addition to obtaining the just-mentioned letter from Rabbi Cohn, personally went to the telephone company's library of old directories here in Los Angeles and was apparently advised by persons there that there were no listings for a Jewish Press for 1937, 1938, 1939 and 1940, but there were such listings in 1943 and 1944. He also ascertained that there was no such listings for 1914 and 1915. He also talked to the aforementioned Maxwell Kaufman, who had sold the Southwest Jewish

standards of investigation and reporting ordinarily adhered to by responsible publishers." (388 U.S. at p. 155 [18 L.Ed.2d at p. 1111].)

[5]This standard of proof (clear and convincing evidence) to establish actual malice in the federal constitutional sense applies at the appellate level as well as at the trial level in that the appellate court must make a de novo review of the record below to satisfy itself that the trier of fact adhered to this standard. (See *New York Times Co.* v. *Sulli-*

Press to Heritage, to determine whether there was any mention of the Southwestern Jewish Review in the discussions that led to or accompanied this sale. Thompson himself, as Cummins' then assistant, searched at the Los Angeles public library the San Diego city directories for the years 1913 through 1923 and was unable to find in them any mention of any Jewish newspaper published in San Diego during those years. In fact, the first listings for any Jewish newspaper in San Diego appeared in 1924, 1925, 1926 and 1927 and were all for the Jewish Community News published at Temple Beth Israel. According to Thompson, a listing for the Jewish Press first appeared in the 1940 San Diego city directory and then again in the 1944 and 1945 publications of such directory.[6] Thompson also telephoned the San Diego public library, Temple Beth Israel (which had changed its name), the San Diego Union Tribune, the U.C.L.A. library and the Huntington library in San Marino, but was unable to locate any mention of the Jewish Community News, the Southwestern Jewish Review or the Southwest Jewish Press, among others. Finally, approximately two weeks before the 1974 article appeared in the Messenger, Thompson personally talked to Rabbi Dubin, who told him that so far as the rabbi knew there was no Jewish publication in San Diego prior to the Temple Beth Israel Bulletin, which he enlarged and named the Jewish Community News.

This prepublication investigation was, of course, not as thorough as it might have been. Neither defendant Cummins nor Thompson ever communicated with the three most obvious sources of the Heritage article the Messenger attacked, namely, the publisher of Heritage, Herbert Brin, the respected Jewish historian, the aforementioned Rabbi Kramer, who was the byline author of the article, and the source given in the article itself of Heritage's claim to a 1914 origin, namely, the Universal Jewish Encyclopedia. Furthermore, as already noted, contrary to one of the headlines in the Messenger article, a Southwestern Jewish Review was published in San Diego, but not as early as 1914. Finally, neither defendant Cummins nor Thompson ever visited the Serra Museum of the San Diego Historical Society.

On the other hand, it cannot be said with any accuracy that defendants published their accusation of the falsity of the Heritage claim that it had been published since 1914 in reckless disregard of the truth or falsity of the accusation or with serious doubts of its truth. De-

---

van, supra, 376 U.S. 254, 282-286 [11 L.Ed.2d 686, 707-710]; *Beckley Newspapers* v. *Hanks* (1967) 389 U.S. 81, 82-83 [19 L.Ed.2d 248, 250-251, 88 S.Ct. 197].)

[6]Actually, the Jewish Community News was also listed in the San Diego city directory for 1931.

fendant Cummins and his assistant, Thompson, had checked before publication with the two rabbis who were at Temple Beth Israel in San Diego from 1920 to 1925 and according to both of them the Temple Bulletin was the only Jewish publication then published in San Diego. Furthermore, Cummins and Thompson, despite a rather thorough search of southern California and San Diego libraries and directories (both telephone and city), were unable to find anything to substantiate Heritage's claim of a 1914 origin in San Diego.[7]

Accordingly, the reduced judgment for Heritage in this libel action must be reversed.

### DISPOSITION

The judgment under appeal is reversed.

Potter, J., and Lui, J., concurred.

A petition for a rehearing was denied November 4, 1981, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied December 30, 1981.

---

[7]The masthead statement of Heritage, that it has been published since 1914, is based upon a common and accepted newspaper practice of using the initial publication date of the oldest of the predecessor newspapers and the fact that these predecessor newspapers generally claimed this initial publication date either expressly or impliedly by volume number or claim of incorporation. Secondary sources, such as the American Jewish Year Book, the Universal Jewish Encyclopedia and the Jewish Press of the World, generally accepted this initial publication date with respect to these publications.

Actually, the oldest Jewish newspaper in San Diego, which was a predecessor of Heritage, was the Jewish Community News. This newspaper possibly started publication in 1918 but probably did so in 1920 when the aforementioned Rabbi Trattner became rabbi of Temple Beth Israel, which was then serving about 100 of the approximately 125 Jewish families then in San Diego. He started making the weekly Temple Bulletin into a weekly Jewish newspaper. Rabbi Dubin succeeded him at the Temple in 1921. As already noted, Dubin enlarged the paper and named it the Jewish Community News.

The Temple Bulletin began as an annual in 1912 and 1913. In 1914 it apparently became more than an annual and in that same year one Sadie Epstein started a little mimeographed newspaper known as the San Diego Jewish Bulletin. This newspaper lasted until 1918 and served principally the Jewish servicemen who were in San Diego during World War I. No connection, however, between this publication and the Jewish Community News was ever established.

The foregoing history of the origin of Heritage perhaps explains Rabbi Dubin's testimony in his deposition, admitted at trial, to the effect that the Heritage claim of a 1914 origin was "absolutely untrue."