Filed 2/1/16  Gordon & Holmes v. Love CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GORDON & HOLMES et al., | B256367 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. BC462438) |
| COURTNEY LOVE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael M. Johnson, Judge.  Affirmed.

Williams Iagmin and Jon R. Williams for Plaintiffs and Appellants.

Dongell Lawrence Finney, John A. Lawrence and Marc Gans for Defendant and Respondent.

Rhonda J. Holmes (Holmes) and Gordon & Holmes (collectively plaintiffs) sued Courtney Love Cobain (Cobain) for defamation, alleging that Cobain committed libel per se in a Twitter comment about Holmes, her former attorney.[1] The trial court granted Cobain's motion for nonsuit as to the claims asserted by Gordon & Holmes and dismissed the claims in their entirety.[2] Holmes' libel per se claim was tried to a jury, which returned a verdict for Cobain. The jury found that although Cobain's Twitter statement was false and tended to injure Holmes in her profession, Cobain did not act with actual malice. Plaintiffs now appeal from the judgment entered on the verdict, contending, in substance, that the evidence compelled the jury to find that Cobain acted with actual malice. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Trial Evidence*

Cobain is the widow of Kurt Cobain of the rock band Nirvana. After her husband's death, Cobain came to believe that various persons had defrauded her, her daughter, and her husband's estate of millions of dollars. In December 2008, Cobain retained plaintiffs to investigate her claims and "go after" the perpetrators.

---

[1]    The defamation suit also was based on an interview of Cobain by a Canadian journalist, Alan Cross. Plaintiffs do not challenge the jury verdict in favor of Cobain as to the Cross article. We therefore address only the Twitter statement.

[2]    Gordon & Holmes purports to appeal from the judgment but has raised no issues regarding the grant of nonsuit. It therefore has forfeited any claims on appeal. (See *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 19, fn. 12 ["issues and arguments not addressed in the briefs on appeal are deemed forfeited"].)

Holmes investigated Cobain's claims from December 2008 through May 2009. She retained a forensic fraud economist and interviewed numerous people Cobain believed had relevant information about the fraud.

Holmes helped Cobain draft a press release that was published in the New York Post on April 7, 2009. The article quoted Holmes as stating that she had been able to "track down" $30 million, but that more was missing, and that "[w]e will be filing civil cases . . . within the next 30 days."

Based on the press release, Cobain expected Holmes to file a complaint by May 7, 2009. On April 24 and 29, 2009, Cobain had 80 boxes of documents delivered to Holmes to help in preparing the complaint.

By early May 2009, Holmes had not filed a complaint. She explained to Cobain that her computer had been hacked. Holmes also told Cobain that Cobain's former counsel had threatened her, and that she had been accosted in a parking lot. Holmes further said that $140,000 had been stolen from her bank account, that she had been the victim of credit card fraud, and that her phone was tapped. Holmes attributed these events to her April 2009 statement in the New York Post and the fraud conspiracy in general.

Unbeknownst to Cobain, on April 27, 2009, Holmes sent an unusual letter to Cobain's daughter Frances, in which she reiterated her claims about the fraud conspiracy. The letter contained personal confidences and also stated that Holmes represented Frances, her grandmother and her aunts, even though she did not. Holmes wrote that Cobain and Frances were "the unfortunate victims of a very large and very scary conspiracy," and that she had "personally experienced the reach and criminality of these thieves."

According to Holmes, an attorney Cobain had hired in a different matter, Keith Fink, criticized Holmes' work to Cobain. Holmes testified that Cobain told Holmes she preferred Fink to her and stopped returning Holmes' phone calls.

A meeting was scheduled for May 4, 2009 involving Cobain, Holmes, and others. Holmes planned to attend by teleconference, but shortly before the meeting, Holmes received an email from Cobain's assistant, Marie Walsh, stating that the meeting was canceled because Cobain was attending a different meeting. Cobain's 80 boxes were retrieved from Holmes that day and delivered to Fink. Cobain testified that her assistants handled the matter, but she believed the boxes were transferred because of an unrelated arbitration matter. She did not intend that Fink replace Holmes.

Holmes testified that sometime after the boxes were retrieved from her, Walsh confirmed to Holmes that Cobain had fired her. According to Cobain, she did not fire Holmes; Holmes was the one who terminated the relationship.

On May 8, 2009, Holmes sent an email to Cobain in which she wrote, "I DID NOT QUIT!" Holmes further wrote that she was "FIERCELY protective" of Cobain and that she was concerned because Fink was "rude and condescending" to Cobain, unethical, and "highly unprofessional." Holmes accused Fink of having told Cobain that Holmes quit.

Cobain did not hear from Holmes again after the May 2009 email, and Holmes never filed a complaint. Cobain thus began to think that Holmes had "disappeared" and been "bought off." Although in January 2009 she had had similar thoughts and later learned she was mistaken, she did not believe she was mistaken this time.

Cobain testified that when she stopped hearing from Holmes, she "didn't want to think the worst, which is that someone had gotten to her, because she

4

didn't seem like that kind of person. . . . I just thought she'd vanished or abandoned us." She said that several people suggested to her that Holmes had been "bought off" and that Holmes herself had used the phrase numerous times to describe other lawyers. Cobain never saw a complaint or any legal document prepared by Holmes. Holmes never sent a letter to Cobain confirming her termination, even though there were statute of limitations issues in the case.

By June 2010, Cobain was trying to determine if Holmes had "vanished." In what she thought was a private conversation with two other Twitter users, Carmela Kelly ("fairnewsspears") and someone named Ed ("noozjunkie"), she was asked if she thought her lawyer was bought off. Cobain replied with the Twitter comment at issue: "I was fucking devastated when Rhonda J. Holmes, Esquire, of San Diego was bought off @FairNewsSpears perhaps you can get a quote." She removed the tweet after five to seven minutes.

Cobain thought the comment was posted as part of a "long dialogue about the fraud stuff" with the two Twitter users, whom she described as "wannabe reporters." She did not intend anyone but those two people to see the comment. Cobain did not think Holmes would see the Twitter comment but did not care if she did. Cobain did not think about the potential harm to Holmes' reputation from the comment because she believed the comment was true when she wrote it.

Explaining the comment, Cobain testified that she did not intend to claim "someone walked up and handed [Holmes] a bunch of cash." Similarly, in response to a request for admission during discovery that was admitted into evidence, Holmes stated she "has never contended and does not contend that HOLMES was ever bribed by any PERSON to cease representing [her] in any litigation." Cobain testified that instead, she meant that Holmes had been "gotten to" or "compromised" in some manner. Cobain's belief was based on the incidents

5

Holmes had reported to her of being threatened, having her computer hacked and her phone tapped, and money stolen from her bank account. Because of these incidents, when Holmes did not file a complaint or return her phone calls, Cobain "freaked out" and thought "maybe . . . someone had hurt her." By 2010, Cobain "firmly believed [Holmes had] been gotten to somehow."

*Verdict*

On Holmes' claim for libel per se, the jury returned a special verdict in which it found that the Twitter statement was false and had a natural tendency to injure Holmes' profession, but that Holmes did not prove by clear and convincing evidence that Cobain knew the statement was false or had serious doubts about the truth of the statement. The court entered judgment in favor of Cobain, and later denied Holmes' motion for a new trial.

**DISCUSSION**

Holmes contends that given Cobain's admission that she did not know whether Holmes had been bribed, and the Oxford Dictionary definition of the phrase "bought off" on which the jury was instructed, the jury was compelled to find that Cobain acted with actual malice. Therefore, Holmes contends that we must set aside the jury's contrary finding that although the Twitter statement was false and injurious to Holmes, Cobain did not know the statement was false or have serious doubts about its truth. At oral argument, Holmes further argued that if the evidence showed that Cobain knew the common meaning of the phrase "bought off" was "bribed," actual malice is established as a matter of law. We are not persuaded.

6

At the outset, we note that Holmes does not dispute that she is a public figure and therefore was required to prove actual malice to prevail on her libel per se claim under *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 (*New York Times*).  (See *Jackson v. Paramount Pictures Corp.* (1998) 68 Cal.App.4th 10, 27.)  "[L]iability under *New York Times* requires clear and convincing proof of a knowing falsehood or of reckless disregard for the truth.  [Citation.]  Recovery by public officials in defamation actions is constitutionally barred unless evidence is produced 'of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" . . . .'  [Citation.]  [¶]  Reckless disregard for the truth 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'  [Citation.]  Lack of due care is not the measure of liability, nor is gross or even extreme negligence.  [Citation.]"  (*McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 860 (*McCoy*).)  "The crucial focus of actual malice under *New York Times* is the defendant's attitude, or state of mind, toward the allegedly libelous material published.  [Citations.]"  (*Id.* at p. 847.)

In reviewing the jury's finding that Holmes failed to prove actual malice, we employ the substantial evidence test, under which "'"'the power of [the] appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the [verdict]."'  [Citations.]'  [Citation.]  We must 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference

7

and resolving all conflicts in its favor . . . .'" (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188 (*Wilson*).)[3]

Viewing the evidence in the light most favorable to Cobain, we conclude that there is substantial evidence to support the jury's finding that although Cobain's statement was false and injurious, Holmes failed to establish by clear and convincing evidence that Cobain knew the statement was false or had serious doubts about the truth of the statement.

The court explained to the jury that the dictionary definition of the term "buy-off" was "to procure the loyalty and support of someone by bribery." However, the court further explained that the jury was "to determine the meaning of all the words and statements in this case from all of the evidence that you hear in the trial; but a dictionary definition is . . . another piece of evidence for [the jury] to

---

[3]    The instant case must be distinguished from one in which an appellate court reviews a jury's finding that actual malice exists. In that situation, "the reviewing court 'must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.' [Citations.] This means that although 'credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses,"' the reviewing court must 'consider the factual record in full' and 'must "'examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect.'"' [Citations.]" (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 275.)

This independent standard of review applies when there has been a finding that actual malice exists "in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' [Citations.]" (*Bose Corp. v. Consumers Union* (1984) 466 U.S. 485, 499; see *id.* at p. 511 [independent review required "in order to preserve the precious liberties established and ordained by the Constitution."].) However, in a case such as this, in which the jury's verdict did not intrude on free expression, there is no concern that the judgment would "strip the utterance of First Amendment protection." (*Ibid.*) Thus, the independent standard of review does not apply.

8

consider."[4] Thus, contrary to Holmes' argument, the trial court did not "direct[]" the jury that the dictionary definition was the only interpretation of "bought off."

The other evidence presented to the jury regarding the meaning of "bought off" was Cobain's testimony that she did not "mean someone walked up and handed you a bunch of cash." She did not think that was "how it's done." Instead, she meant that Holmes had been "gotten to," "threat[ened] by more powerful counsel," or "compromised in some fashion," thus causing her to "vanish[]" or to "abandon[] [Cobain]."

Cobain's response to Holmes' Request for Admissions No. 10 was admitted into evidence. The request asked Cobain to admit that she had no knowledge of Holmes having been bribed to stop representing her. Cobain responded, "Not applicable. Defendant has never contended and does not contend that HOLMES was ever bribed by any PERSON to cease representing Defendant in any litigation."

The dictionary definition of "buy-off" and Cobain's lack of knowledge whether Holmes had been bribed to stop representing her do not constitute "clear and convincing proof of a knowing falsehood or of reckless disregard for the truth." (*McCoy*, *supra*, 42 Cal.3d at p. 860.) In determining whether a statement is

---

[4]     The jury subsequently was instructed that in order to establish her defamation claim, Holmes needed to prove that it was more likely true than not that (1) Cobain made the statement to persons other than Holmes; (2) these people reasonably understood the statement was about Holmes; and (3) these people reasonably understood the statement to have a natural tendency to injure Holmes' profession, trade or business. The jury further was instructed that Holmes needed to prove by clear and convincing evidence that the statement was false, and Cobain knew the statement was false or had serious doubts about the truth of the statement. The jury was not instructed on the definition of the phrase "bought off."

libelous per se, "the context of the communication must be examined. [Citations.]" (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1174.)

Here, Holmes never filed the complaint despite her April 2009 statement in the New York Post that she would do so within 30 days. Holmes told Cobain that her computer had been hacked, her phone had been tapped, money was stolen from her bank account, Cobain's former counsel had threatened her, and that she had been accosted in a parking lot. After the May 2009 email in which Holmes wrote, "I DID NOT QUIT," Cobain never heard from Holmes again. Holmes never sent a letter to Cobain confirming that she was no longer representing her. Thus, although Cobain may not have known for certain whether "someone walked up and handed [Holmes] a bunch of cash," by 2010, Cobain firmly believed Holmes had been compromised or "gotten to" in some manner. Under these circumstances it was not reckless for Cobain to believe that Holmes had been induced to stop representing her. Given the context of the statement, substantial evidence supports the jury's finding that Holmes did not prove by clear and convincing evidence that Cobain knew her statement was false or had serious doubts as to its truth.

Holmes' contention that actual malice is satisfied as a matter of law based on the dictionary definition of "buy-off" and Cobain's admission that she did not know whether Holmes had been bribed is similar to the argument rejected by our supreme court in *Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) 22 Cal.3d 672 (*Good Government*).) There, the court held that the defendants in a libel action were not entitled to summary judgment because there was a triable issue of fact as to whether their statement that the plaintiff, a city councilman, had "'extorted by blackmail' $100,000 from a development company" was libelous. (*Id.* at p. 677.) The defendants argued that they did not intend to state that the plaintiff in fact committed extortion or blackmail but that the

10

statement was merely "sharp criticism of his conduct, using figurative language." (*Id.* at p. 679.) The plaintiff argued that actual malice was satisfied because the defendants conceded they were aware prior to publication that the plaintiff had never committed extortion or blackmail. The issues therefore were whether the statement constituted a false statement of fact or merely an opinion, and whether a sufficient showing of malice was made to defeat summary judgment. (*Id.* at p. 680.)

The court rejected the plaintiff's "simplistic" argument that malice was established by the defendants' concession that they were aware the plaintiff had not committed extortion or blackmail. (*Good Government*, *supra*, 22 Cal.3d at p. 683.) The court explained that, if that were the standard, "a defendant who makes a statement which is ambiguous in the sense that it can reasonably be viewed as either fact or opinion, but who neither intends the statement to bear a factual meaning nor believes that it will be understood by the reader in that fashion, will be guilty of libel if a jury later determines that the article was understood in its factual, defamatory sense. [¶] Such a holding would render a defendant liable for a defamatory statement negligently made and would create precisely the chilling effect on speech which the *New York Times* rule was designed to avoid." (*Id.* at pp. 683-684.) The court thus held that "in order to find the requisite malice from the publication of ambiguous words which could constitute either fact or opinion, the jury must find not only that the words were reasonably understood in their defamatory, factual sense, but also that the defendant either deliberately cast his statements in an equivocal fashion in the hope of insinuating a defamatory import to the reader, or that he knew or acted in reckless disregard of whether his words would be interpreted by the average reader as defamatory statements of fact." (*Id.* at p. 684.)

Here, the jury found that Cobain's statement was a fact, not an opinion, and that it was injurious to Holmes. The jury therefore found that calling Holmes "bought off" would be interpreted by the average reader as a defamatory statement of fact. However, there was no jury finding as to the meaning of "bought off." Therefore, it is not clear whether the jury found that the phrase specifically meant "bribed," or whether it included the broader meaning suggested by Cobain that Holmes was "gotten to" or compromised in some manner other than by being "handed . . . a bunch of cash."

The term "bought off" is not as specific as "bribe," and, as discussed above, the evidence regarding the meaning of "bought off" presented to the jury included not only the dictionary definition but also Cobain's testimony. Cobain testified that the statement was in response to the question whether she believed her attorney had been bought off. Given the context – asked if she thought her lawyer was bought off – and the fact that the two people she thought she was writing to knew the circumstances – an objective reader would not necessarily understand that Cobain intended to say that Holmes had been bribed, but rather that Holmes had abandoned Cobain for an unknown reason.

Even were we to assume that the jury was required to find that the only possible interpretation of "bought off" was "to procure the loyalty and support of someone by bribery," Cobain's testimony supports the finding that she in fact believed that Holmes had been pressured to stop representing her. Holmes presented no evidence to establish that Cobain "'in fact entertained serious doubts as to the truth of'" her statement. (*McCoy*, *supra*, 42 Cal.3d at p. 860.)

Holmes contends that *Montandon v. Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938 (*Montandon*) stands for the proposition that if a defendant knows the objective meaning of her statement is false, actual malice is established despite

12

the defendant's subjective understanding of the statement. However, *Montandon* does not support that position. In *Montandon*, the defendant magazine issued a press release advertising a television show on which the plaintiff, the author of a book about being a "party girl," was to appear along with a prostitute, who was described as a "call girl." The magazine edited the press release several times and ultimately released a version omitting crucial information, such that it was unclear that the plaintiff was appearing with a prostitute and that the terms "party girl" and "call girl" referred to two different people. (See *id.* at pp. 941-942.) The jury found that the statement was libelous and made with actual malice, and the appellate court affirmed. (*Id.* at pp. 944, 953.)

*Montandon* is inapposite. First, contrary to Holmes' characterization of *Montandon*, the defendant did not rely on a subjective interpretation of the term "call girl." Instead, the defendant argued that the statement did not clearly refer to the plaintiff as a call girl. (See *Montandon*, *supra*, 45 Cal.App.3d at p. 944.) Second, there was substantial evidence in *Montandon* that the defendant not only knew the plaintiff was not a call girl but published the statement in reckless disregard of whether it was true. The defendant's employees altered the original statement by removing the reference to the prostitute who was appearing on the show with the plaintiff and thus were forced to acknowledge that the statement as published "conveyed the impression" that the term "call girl" referred to the plaintiff. (*Montandon*, *supra*, 45 Cal.App.3d at p. 944.) Because the evidence showed that the defendant intentionally "decided not to tell the public" about the prostitute who was appearing on the show with the plaintiff, "it was reasonable for the jury to find . . . that the publication of this statement was a reckless disregard of the truth or falsity of the statement." (*Id.* at pp. 944-945.) There is no such

13

evidence here of intentional or reckless disregard of the truth.  *Montandon* thus does not support Holmes' position.

We must view the evidence in the light most favorable to Cobain and give her the benefit of every reasonable inference.  (*Wilson*, *supra*, 169 Cal.App.4th at p. 1188.)  Doing so, it would be reasonable for the jury to conclude that by saying that Holmes was bought off, Cobain meant that Holmes had been induced in some manner to stop representing her – whether by consideration or by threat. Moreover, given Cobain's repeated testimony that she believed Holmes had been "compromised" or "gotten to," substantial evidence supports the jury's finding that Holmes did not prove by clear and convincing evidence that Cobain knew the statement was false or had serious doubts about the truth of the statement when she made it.

## DISPOSITION

The judgment is affirmed.[5]  Cobain is entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:



MANELLA, J.




COLLINS, J.

---

[5]      Holmes purports to appeal from the court's denial of her motion for new trial. Holmes does not support her contention with argument and therefore has forfeited her challenge to the court's denial of her motion.  (See *Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1207 [appellant waived challenge to denial of new trial motion and motion to set aside the judgment by failing to make any cognizable claim of error on appeal].)  Even if not forfeited, Holmes' new trial motion was based on the same arguments raised on appeal.  In light of our conclusion that the judgment should be affirmed, the trial court did not abuse its discretion in denying the motion.  (See *David v. Hernandez* (2014) 226 Cal.App.4th 578, 588-589 ["'[A] motion for new trial predicated on the ground[] of the insufficiency of the evidence . . . is addressed to the sound discretion of the trial judge; his action in refusing a new trial will not be disturbed on appeal unless it is affirmatively shown that he abused his discretion.  [Citation.]' [Citation.]"].)

15