Carolyn CONDIT, Plaintiff,

v.

NATIONAL ENQUIRER,
INC., Defendant.

No. CIV F 02–5198 OWW LJO.

United States District Court,
E.D. California.

July 10, 2002.

Brian Anthony Rishwain, Johnson and Rishwain LLP, Los Angeles, CA, Rodney Smolla, University of Richmond, T C Williams School of Law, Richmond, VA, for Carolyn Condit, plaintiff.

Bruce Alan Owdom, Dietrich Glasrud Mallek and Aune, Fresno, CA, Adam Lindquist Scoville, Pro Hac Vice, Thomas B Kelley, Pro Hac Vice, Steven D Zansberg, Pro Hac Vice, Faegre & Benson, Denver, CO, Michael B Kahane, Pro Hac Vice, American Media Inc, Law Department, Boca Raton, FL, for National Enquirer Inc, American Media, Inc., defendants.

## MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO DISMISS OR STRIKE, OR, ALTERNATIVELY, SUMMARY JUDGMENT AND ATTORNEY'S FEES

WANGER, District Judge.

## I. *INTRODUCTION*

Carolyn Condit ("Plaintiff") sues National Enquirer, Inc. ("Defendant"), and un-

named Does for libel based on statements published in two issues of Defendant's weekly publication, *The National Enquirer*, dated August 7 and September 4, 2001. *See* Doc.1, Complaint, filed February 21, 2002. Diversity jurisdiction is invoked under 28 U.S.C. § 1332, based on the parties' citizenship in different states and the amount in controversy in excess of the $75,000 jurisdictional minimum. Defendant moves to dismiss or strike Plaintiff's Complaint under Fed.R. Civ.P. 12(b)(6), or alternatively, for summary judgment and attorney's fees under California Code of Civil Procedure section 425.16 prohibiting Strategic Lawsuits Against Public Participation. *See* Doc.19, filed April 1, 2002. Plaintiff opposes Defendant's motion. *See* Doc.28, filed June 17, 2002. Oral argument was heard July 1, 2002.

## II. *BACKGROUND*

Plaintiff is a California citizen and the wife of former United States Congressman Gary A. Condit. *See* Complaint at ¶ 3. Plaintiff's Complaint alleges she is not a public figure, has never given, or granted a request for her to give, an interview to a journalist, and has not voluntarily injected herself into a matter of public concern in an attempt to influence the outcome of a controversy. *See id.* Defendant's articles, exhibits 1 and 2 to the Complaint, confirm that Plaintiff is a "private" person who has not participated in her husband's public life. Defendant is a corporation with its principal place of business in Boca Raton, Florida. *See* Complaint at ¶ 4. Defendant disseminates a weekly publication, *The National Enquirer* (the *"Enquirer"*). *See id.*

Some time before July 26, 2001, the *Enquirer* reported on its website, <http://www.nationalenquirer. com>, that "just days before" the disappearance of Mr. Condit's intern, Chandra Levy, Plaintiff phoned Mr. Condit's Washington, D.C., apartment from the Condits' home in Ceres, California, and verbally attacked Ms. Levy during a five-minute telephone conversation. *See* Complaint at ¶ 6. On July 26, 2001, the Washington Metro Police Department responded to the *Enquirer*'s report and debunked the reported phone call with the following statement from Chief Terrance W. Gainer: "I don't think there's any truth to that whatsoever." *See id.* at ¶ 7. The following day, July 27, 2001, Washington Metro Police spokesperson Joe Gentile also dismissed the *Enquirer*'s report, stating: "I am saying there is no foundation to that report." *See id.*

Several newspapers, including the USA Today, New York Post, and Washington Times, reported the information that was posted on the *Enquirer*'s website, including that Plaintiff verbally attacked Ms. Levy over the telephone just days before her disappearance. *See id.* at ¶ 8. Plaintiff alleges that notwithstanding the statements by Washington Metro Police Department personnel, the *Enquirer* on August 7, 2001, published an article describing the purported angry phone call between Plaintiff and Ms. Levy. *See id.* at ¶ 9.

Plaintiff's Complaint contains three claims for libel. *See* Complaint. The first claim alleges Defendant published the following "First Offending Statements" in the August 7, 2001, edition of the *Enquirer*: 1) the large, bold-faced, all-caps headline on the cover: "COPS: CONDIT'S WIFE ATTACKED CHANDRA"; 2) the sub-headlines on the cover: "The furious phone call," and "What wife is hiding"; 3) the story headline in all-caps on page 32: "COPS: CONDIT'S WIFE ATTACKED CHANDRA"; and 4) the first paragraph of the article on page 32: "Gary Condit's bitter wife flew into a rage and attacked Chandra Levy in a furious confrontation just days before the intern's disappearance, The ENQUIRER has learned exclu-

sively." *See* Complaint at ¶¶ 13–15, Exh. A.

Plaintiff alleges the First Offending Statements are libelous on their face, per se, because they imply Plaintiff committed crimes of assault and battery. *See* Complaint at ¶ 16. Plaintiff alleges the First Offending Statements are reasonably susceptible of a defamatory meaning because they falsely insinuate or state: a) the police believe, and the true fact is, that Plaintiff physically attacked and/or was physically involved in the disappearance of Ms. Levy; b) Plaintiff is hiding information about Ms. Levy's disappearance; and c) Plaintiff had a telephone call with Ms. Levy "just days before" Ms. Levy's disappearance. *See* Complaint at ¶¶ 17–18. Plaintiff alleges she has never seen Ms. Levy in person or spoken to her on the telephone, and telephone records show no phone call made "days before" Ms. Levy's disappearance from Plaintiff's home in Ceres, California, to Mr. Condit's apartment in Washington, D.C. *See* Complaint at ¶ 18.

Plaintiff alleges Defendant was aware the cover and story headlines were misleading but made no attempt to clarify their meaning prior to publication. *See* Complaint at ¶ 19. Since Defendant's in-house counsel and vice president, Michael Kahane, has performed pre-publication review for another tabloid, the *Globe*, since 1995, Plaintiff asserts Defendant was subjectively aware the headlines in the First Offending Statements conveyed a defamatory or potentially defamatory meaning in light of *Kaelin v. Globe Comms. Corp.*, 162 F.3d 1036 (9th Cir.1998), which held the following headline reasonably susceptible of a defamatory meaning: "COPS THINK KATO DID IT!" *See* Complaint at ¶ 19. The Complaint charges Defendant recklessly disregarded its awareness of the defamatory meaning of the First Offending Statements by failing to explore whether a

defamatory meaning was communicated. *See id.* Plaintiff claims Defendant deliberately intended to convey the impression that Plaintiff physically attacked Ms. Levy or that her disappearance was a result of Plaintiff's jealous rage when Defendant had no reason to believe that impression was true. *See id.*

Plaintiff's second claim alleges Defendant published the "Second Offending Statements" in the August 7, 2001, edition of the *Enquirer* in the story beginning on page 32: 1) "In a major breakthrough, investigators have uncovered what they say is the 'blowup phone call' between Chandra and Carolyn Condit—during which the 24–year–old intern told an enraged Carolyn that Gary was dumping her to start a new life and family with Chandra"; 2) "The Justice Department source confirmed: 'Investigators are now sure that Mrs. Condit talked with Chandra Levy in the days before her disappearance'"; and

3) In a bombshell disclosure, a source told the *Enquirer:* "Investigators got phone records that show a phone call from Condit's home in California to his apartment in Washington that was over five minutes long.

. . .

From their extensive work including interviews with Condit, his wife, and Chandra's family members and friends, investigators now say that Chandra and Carolyn had a heated conversation. When the phone rang, Chandra was in the apartment and saw from the caller ID that it was from Condit's home in California. And she boldly answered it.

Chandra and the wife had a heated phone screamfest. . . ."

Complaint at ¶¶ 25–26.

Plaintiff's third claim alleges Defendant published the "Third Offending Statement" in the September 4, 2001, edition of the *Enquirer:* "Just days before the in-

tern's disappearance Carolyn flew into a rage at Chandra during a phone call." Complaint at ¶ 34. Plaintiff asserts Defendant recycled the information about the phone call from the August 7, 2001, issue of the *Enquirer* without further corroboration by additional sources. *See id.* at ¶ 36. Defendant or its purported source or sources fabricated the "furious phone call" and that any source on the matter was not credible because the story is unsupported by phone records and no such call occurred. *See id.*

The Complaint charges that Defendant published the First, Second, and Third Offending Statements (collectively, the "Offending Statements") with negligence and constitutional and actual malice with knowledge that they were false or with a reckless disregard for their truth or falsity. *See id.* at ¶¶ 19, 28, 36. Defendant was aware, at least eleven days before publishing the August 7, 2001, issue and forty days before publishing the September 4, 2001, issue, that the Washington Metro Police Department denied the alleged phone call ever took place. *See id.* Without attempting to interview Plaintiff, Defendant recklessly ignored the known contradictory statements by Washington Metro Police and published the Offending Statements. *See id.*

The Complaint asserts Defendant had a "pecuniary motive" to publish headlines and stories reasonably susceptible of a defamatory meaning. *See id.* Defendant "had a predetermined bias against Mrs. Condit" and broke the story as a "World Exclusive" in an attempt "to gain sole credit as the first to sully Mrs. Condit's reputation and to drag her into the morass." *Id.* The purported source is twice removed from any original source, but "Defendant purposely avoided the truth by failing to adequately fact-check to confirm the accuracy of the offending statements . . . where the implication of the offending

statements are serious enough to warrant some type of substantiation." *Id.* "This was not 'hot news' for which there was an urgent need to publish without actual verification . . . ." *Id.*

Plaintiff seeks $10,000,000.00 in general damages. *See id.* Plaintiff alleges she suffered emotional distress, including loss of reputation, humiliation, powerlessness, frustration, and anger, as well as discredit in the eyes of the public. *See* Complaint at ¶ 20. Plaintiff seeks punitive damages "in an amount appropriate to punish or set an example of the defendant." *Id.* at ¶¶ 21, 30, 38. Plaintiff demands an apology and a retraction to be published in the *Enquirer. See id.* at ¶¶ 22, 31, 39. Plaintiff admitted at oral argument she did not demand a correction from Defendant within twenty days following her knowledge of the publication as specified by California Civil Code section 48a.

## III. *LEGAL STANDARDS*

### A. *Motion to Dismiss*

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is disfavored: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir.1997) (issue is not whether plaintiff will ultimately prevail, but whether claimant is entitled to offer evidence to support the claim). In deciding a motion to dismiss, the court accepts as true all material allegations in the complaint and construes them in the light most favorable to the plaintiff. *See Oscar v. University Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir.1992); *NL Industries v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986).

The court need not accept as true allegations that contradict facts which may be judicially noticed. *See Mullis v. United States Bankruptcy Ct.,* 828 F.2d 1385, 1388 (9th Cir.1987). For example, matters of public record may be considered, including pleadings, orders, and other papers filed with the court or records of administrative bodies, *see Mack v. South Bay Beer Distributors,* 798 F.2d 1279, 1282 (9th Cir. 1986), while conclusions of law, conclusory allegations, unreasonable inferences, or unwarranted deductions of fact need not be accepted. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981); *see also Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994) ("[A] document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned."). Allegations in the complaint may be disregarded if contradicted by facts established by exhibits attached to the complaint. *See Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987).

### B. *Summary Judgment*

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *see California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in a light most favorable to the nonmoving party. *See Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102–03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence from which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1107 (9th Cir.2000). Instead, the nonmoving party, through affidavits or other admissible evidence, "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P 56(e).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

Evidence submitted in support of, or in opposition to, a motion for summary judgment must be admissible under the standard articulated in 56(e). Properly au-

thenticated documents can be used in a motion for summary judgment if the appropriate foundation is provided by affidavit or declaration. *See Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1550–51 (9th Cir.1990). Supporting and opposing affidavits must be made on personal knowledge, set forth such facts as would be admissible in evidence, and show that the affiant is competent to testify to the matters stated therein. *See* Fed.R. Civ.P. 56(e).

"Questions of statutory construction and legislative history present legal questions which are properly resolved by summary judgment." *T H Agric. & Nutrition Co. v. Aceto Chem. Co.,* 884 F.Supp. 357, 359 (E.D.Cal.1995) (citations omitted).

## IV. *ANALYSIS*

Defendant moves under Rule 12(b)(6) to dismiss or strike Plaintiff's claims, or alternatively under Rule 56 for summary judgment, on the grounds: 1) California's anti-SLAPP suit statute applies because Plaintiff's case is a "meritless First Amendment case designed to chill free exercise" and fails to demonstrate a probability of success on her claims; 2) Plaintiff does not allege special damages and did not seek a correction as required by California Civil Code section 48a; and 3) the Offending Statements are not reasonably susceptible of a defamatory meaning. *See* Doc.19.

### A. *California's Anti–SLAPP Suit Statute*

In 1992, the California Legislature enacted a provision commonly known as an "anti-SLAPP suit" statute. *See* Cal. Civ. Proc. § 425.16. Strategic Lawsuits Against Public Participation ("SLAPP suits")[1] are legally meritless suits filed in order "to obtain [a political or] economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff." *Briggs v. Eden Council for Hope & Opportunity,* 19 Cal.4th 1106, 1126, 81 Cal. Rptr.2d 471, 969 P.2d 564 (1999). SLAPP suits may tend to chill the exercise of the constitutional right to free speech by instilling fear of enormous recoveries and legal fees into their targets. Section 425.16 was enacted "to encourage continued participation in matters of public significance," especially by small groups and lone individuals whose "participation should not be chilled through abuse of the judicial process." Cal. Civ. Proc. § 425.16(a).[2]

Cal.Code Civ. Proc. § 425.16(b)(1) provides:

A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. § 425.16(b)(1).

In the Ninth Circuit and California, section 425.16 applies to state law

---

**1.** The acronym, "SLAPP," was coined by Penelope Canan and George W. Pring, professors at the University of Denver. *See Canan & Pring, Strategic Lawsuits Against Public Participation,* 35 Soc. Probs. 506 (1988).

**2.** "The paradigm SLAPP suit is an action filed by a land developer against environmental activists or objecting neighbors of the proposed development. However ... SLAPPs are by no means limited to environmental issues nor are the defendants necessarily local organizations with limited resources. The statute is appropriately applied to litigation involving conduct by a defendant which was directed to obtaining a financial advantage." *Ludwig v. Sup.Ct.,* 37 Cal.App.4th 8, 14–15, 43 Cal.Rptr.2d 350 (1995) (citations omitted).

claims advanced in a federal diversity action. *See United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.,* 190 F.3d 963, 970–73 (9th Cir.1999) (concluding, after analysis under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), that important substantive state interests are furthered by the anti-SLAPP statute; no identifiable federal interest would be undermined by applying the anti-SLAPP statute in diversity actions; and finding that prohibiting application of the anti-SLAPP statute in federal diversity actions would promote forum-shopping). A special motion to strike under section 425.16 can be based on any defect in the Complaint, including legal deficiencies addressable on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), or a failure to support a stated claim with evidence, analogous to a motion for summary judgment under Fed.R. Civ.P. 56. *See Rogers v. Home Shopping Network, Inc.,* 57 F.Supp.2d 973, 976 (C.D.Cal.1999).[3]

▇ Statements are subject to section 425.16(e)(3)-(4)'s anti-SLAPP provisions only if they can be characterized as statements made in a public forum or in furtherance of the exercise of the constitutional rights of petition or speech in connection with an issue of public interest. *See Globetrotter Software v. Elan Computer Group,* 63 F.Supp.2d 1127, 1130 (N.D.Cal.1999) (holding section 425.16 did not apply to statements of one company regarding the conduct of a competitor company); *See* Cal. Civ. Proc. § 425.16(e)(3)-(4).

A newspaper should not be deemed a "public forum" for purposes of § 425.16. Therefore, National Enquirer can invoke the protections of § 425.16 only if its speech falls within the scope of subsection (e)(4).... California decisions seem clear that the fact that a statement appeared in a newspaper is insufficient to satisfy [the "public interest"] element. It is true that California courts have found the public issue or issue of public interest element to be satisfied by speech on many different subjects. *See, e.g., Sipple,* 83 Cal.Rptr.2d at 682–85 (whether nationally known campaign consultant regarding women's issues engaged in wife-beating is public issue); *Dove Audio,* 54 Cal.Rptr.2d at 834 ("whether money designated for charities was being received by those charities" is question of public interest); *Beilenson,* 44 Cal.App.4th 944, 52 Cal. Rptr.2d 357 (speech alleging unethical conduct of public official is of public interest); *Matson,* 46 Cal.Rptr.2d at 885–86 (speech regarding "qualifications of a declared candidate for public office is a public issue").

*Rogers,* 57 F.Supp.2d at 985 n. 7 ("However, none of these cases held that celebrity-watching is inherently a public issue.") (citations partially omitted).

[T]he question whether the statements concerned a matter of public interest cannot be determined on the basis of media coverage, notoriety or potential newsworthiness. It would be absurd to suppose that a newspaper can generate a public issue by the mere fact of print-

---

**3.** *Rogers* explains:

§ 425.16 applies in federal court. However, it cannot be used in a manner that conflicts with the Federal Rules. This results in the following outcome: If a defendant makes a special motion to strike based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of § 425.16(c) applies. If a defendant makes a special motion to strike based on the plaintiff's alleged failure of proof, the motion must be treated in the same manner as a motion under Rule 56 except that again the attorney's fees provision of § 425.16(c) applies.

*Rogers,* 57 F.Supp.2d at 983.

ing a story, even when it expects lively interest among its readers. If that were the case, a newspaper could bring itself, and others, within the statute by its own decision to cover a controversy even if the public has no interest in it. *Zhao v. Wong*, 48 Cal.App.4th 1114, 1131, 55 Cal.Rptr.2d 909 (1996) (superseded by subsection (a) of 425.16 which provides that 425.16 be construed broadly).

■ California's anti-SLAPP statute applies to the Offending Statements only if they can be characterized as statements made in connection with an issue of public interest for reasons other than that they were made in a widely distributed publication. *See, e.g., Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839–840 (9th Cir. 2001) (plaintiff conceded that allegedly defamatory statements regarding safety of products intended for human consumption involved a matter of public concern); *Braun v. Chronicle Publishing Co.*, 52 Cal. App.4th 1036, 61 Cal.Rptr.2d 58, (1997) (section 425.16 applies to newspaper reports describing an investigative audit carried out by the State Auditor). Defendant contends reports concerning investigations into possible commission of crimes and missing persons are matters of "public concern" and "general public interest." *See* Doc.19 at pp.4–5 (citing cases outside the context of section 425.16). Defendant further contends Plaintiff was properly the subject of public interest because she was the wife and family member of a United States Representative. *See id.* at p.5.

Although section 425.16 is to be construed broadly, *see* Cal. Civ. Proc. § 425.16(a), it does not appear Defendant is being sued for making statements related to a "public issue" or "issue of public interest" within the meaning and intent of California's anti-SLAPP statute. Cal. Civ. Proc. § 425.16(e)(4). Even assuming arguendo that Plaintiff is a "public figure" for First Amendment purposes, not all

speech concerning her necessarily bears on a "public issue" or an "issue of public interest" for purposes of § 425.16(e). *See Rogers*, 57 F.Supp.2d at 985 n. 7. Plaintiff is not a public official. The disappearance of Ms. Levy does not concern the performance of duties by Mr. Condit in his capacity as a public official. The criminal investigation of the disappearance of Ms. Levy is not necessarily a political or community issue in which public opinion and input is inherent and desirable, although it is arguable that there is a law enforcement purpose that underlies efforts to keep the case in the media and before the public to assist in efforts to locate a missing person. This lawsuit concerns disputed claims over defamation, not the type of meritless case brought to obtain a financial or political advantage over or to silence opposition from a defendant, which California's anti-SLAPP statute is designed to discourage. The Complaint appears to be an attempt to vindicate Plaintiff's legally cognizable right in reputation not to be falsely accused of attacking Ms. Levy shortly before her disappearance or of hiding material information about a missing person from the investigating criminal authorities. In the context of the Complaint, Defendant seeks to utilize the anti-SLAPP law to gain immunity from alleged defamation, not to be free of a wrongfully intimidating meritless lawsuit designed to stifle desirable political or public speech.

At this juncture, accepting as true the well-pleaded allegations of the Complaint, Plaintiff could succeed on the merits. Defendant's motion to dismiss or strike, or alternatively, for summary judgment and attorney's fees on the ground California's anti-SLAPP suit statute applies is DENIED.

**B.** *Defendant's Status as a Newspaper under Civil Code Section 48a*

Defendant moves to dismiss the Complaint on the ground Plaintiff does not

allege special damages and did not seek a retraction as required by California Civil Code section 48a. Plaintiff's Complaint does not assert she served a notice and demand for correction within twenty days of knowledge of the offending publication and admitted at oral argument she did not.

### 1. *The Purpose of Cal. Civ.Code Section 48a*

California Civil Code section 48a provides, in relevant part:

> In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and not be published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous.

Cal. Civ. § 48a(1).

> "Special damages" are all damages which plaintiff alleges and proves that [s]he has suffered in respect to h[er] property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves [s]he has expended as a result of the alleged libel, and no other.

Cal. Civ. § 48a(4)(b).

■ Section 48a extends protection in recognition of the necessity to disseminate news while it is new, even if untrue, but whose falsity there is neither time nor opportunity to ascertain. *See Werner v. Southern Cal. Associated Newspapers,* 35 Cal.2d 121, 128, 216 P.2d 825 (1950). A sheltered news publication must function under such time constraints in its mode of operation that prevent accuracy checks or make it impractical to avoid inadvertent publication errors. *See Field Research Corp. v. Sup.Ct.,* 71 Cal.2d 110, 113–14, 77 Cal.Rptr. 243, 453 P.2d 747 (1969).

### 2. *The 48a Inquiry Is One of Law*

■ Whether the *Enquirer* is a "newspaper," i.e., reports on "breaking" news, providing current coverage of subjects such as politics, sports, or crime and makes reference to time, within the meaning of Cal. Civ. § 48a is an issue of law. *See Burnett v. Nat'l Enquirer, Inc.,* 144 Cal.App.3d 991, 1000 n. 4, 193 Cal.Rptr. 206 (1983) (citing *Montandon v. Triangle Publications, Inc.,* 45 Cal.App.3d 938, 953, 120 Cal.Rptr. 186 (1975)). "[T]he protection afforded by the statute is limited to those who engage in the immediate dissemination of news on the ground that the Legislature could reasonably conclude that such enterprises cannot always check their sources for accuracy and their stories for inadvertent publication errors." *Burnett,* 144 Cal.App.3d at 1004, 193 Cal.Rptr. 206 (citation and alterations omitted); *see also In re Cable News Network,* 106 F.Supp.2d 1000, 1001 n. 2 (N.D.Cal.2000) ("application of § 48a depends not upon the publication's label as a "newspaper" or a "magazine" but rather upon its role (or lack thereof) in disseminating breaking news") (citing *Burnett* ).

### 3. *What is a § 48a "Newspaper"?*

■ Whether a publication "ought to be characterized as a newspaper or not within the contemplation of section 48a [is] a question which must be answered … in terms which justify an expanded barrier against damages for libel in those instances, and those only, where the constraints of time as a function of the requirements associated with production of the publication dictate the result." *Bur-*

*nett,* 144 Cal.App.3d at 1004, 193 Cal. Rptr. 206. While "mindful of the semantic difficulties inherent in the use . . . of such words as 'immediate' ('timely') and 'news'," *Burnett* focused the section 48a inquiry on the timeliness aspect of news dissemination as it functions within the publication's mode of operation rather than other "newsworthiness" aspects of a publication's content such as readership interest and visibility in the media. *Burnett,* 144 Cal.App.3d at 1004 n. 6, 193 Cal.Rptr. 206.

In *Burnett,* Carol Burnett sued Defendant for libel based on a four-sentence report printed in the March 2, 1976, issue of the *Enquirer. See Burnett,* 144 Cal. App.3d at 996–97, 193 Cal.Rptr. 206. The California Court of Appeal affirmed the trial court's determination, based on extensive evidence presented at a hearing, that the *Enquirer* was not a newspaper within the meaning of section 48a. *See Burnett,* 144 Cal.App.3d at 1000–01, 1005, 193 Cal. Rptr. 206. The evidence showed the *Enquirer* was denominated a "newspaper" by some entities for various purposes and a "magazine" by others. *See Burnett,* 144 Cal.App.3d at 999–1000, 193 Cal.Rptr. 206.

On the key aspect of timeliness, the evidence showed the *Enquirer* 1) did not subscribe to the Associated Press or United Press International news services, but did subscribe to Reuters News Service; 2) did not attribute content to wire services; 3) provided little or no current coverage of subjects such as politics, sports or crime; 4) did not generally make reference to time; 5) did not generate stories day to day as a daily newspaper does; and 6) had a lead time[4] for its stories of one to three weeks. *See Burnett,* 144 Cal.App.3d at 999–1000, 193 Cal.Rptr. 206. *Burnett* held the trial court correctly determined from the evidence that the *Enquirer*'s publication process and business mode did not justify the preferred status bestowed upon newspapers limited in time and opportunity to ascertain the complete accuracy of all items printed while serving the public interest in the optimal dissemination of news. *See Burnett,* 144 Cal.App.3d at 1001–02, 193 Cal.Rptr. 206.

■ Defendant contends the existing *Enquirer* "is markedly different from the [*Enquirer*] as it existed over twenty-five years ago . . . ." Doc.19 at p.7:19–21. The editor of the *Enquirer,* David Perel, states the weekly publication now provides current coverage of politics, sports and crime and does, in general, make reference to time. *See id.* at p.7:21–25. He claims, without foundation, the *Enquirer* broke several significant stories related to presidential candidate Gary Hart's relationship with Donna Rice (1987). Mr. Perel also refers to coverage of the O.J. Simpson murder trial (1994–95), the murder of entertainer *Bill Cosby's* son, Ennis (1997), an out-of-wedlock child fathered by the Rev. Jesse Jackson (2001), and money paid by the brother of Sen. Hillary Rodham Clinton's brother, Hugh Rodham, to secure a presidential pardon for Almon Glen Braswell, a businessman convicted of mail fraud and perjury, and the release from prison of Carlos Vignali, a cocaine trafficker. *See* Doc.22 at ¶¶ 5–10.

Plaintiff rejoins "Defendant has made no meaningful attempt to compare the content of *The National Enquirer* as it existed in 1976 and the content of today." Doc.28 at p.10:6–7. Plaintiff contends the 2001 *Enquirer* has few features similar to a true newspaper and does not publish "news while it is new." *See id.* at p.8:12–15. Plaintiff contends many of the *Enquir-*

---

4. *Burnett* defines "lead time" as "the shortest period of time between completion of an article and the time it is published." *See Burnett,* 144 Cal.App.3d at 1000 n. 3, 193 Cal.Rptr. 206.

er's stories concern events which transpired in preceding years, do not contain dates or any indications the content was quickly brought to press, and are regular features such as "All the Buzz," "All the Gossip," and "Planet Tabloid," which consist of editorialized comments and opinions. *See id.* at pp.8–9. The *Enquirer* solicits stories from readers for money with phrases such as "Got news for Us? We've Got $500 for You." *Id.* at p.9.

The content of the *Enquirer* is relevant only insofar as it shows whether the *Enquirer* of today serves the public interest by currently disseminating news so as to warrant protection under section 48a. Plaintiff's suggestion that *Burnett*'s findings are claim or issue preclusive on the 48a status of the *Enquirer* does not follow if the news gathering and publishing activities of Defendant have materially changed. *See United States v. Westlands Water Dist.*, 134 F.Supp.2d 1111, 1133–34 (E.D.Cal.2001) (citing *Robi v. Five Platters*, 838 F.2d 318, 321–22 (9th Cir.1988)). See also *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1113–18 (9th Cir.1999), and the four factor test of *Steen v. John Hancock Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir.1997). Comparison of the *Enquirer* of 1976 and the *Enquirer* of 2001, under the six *Burnett* factors, reveals:

1) *Subscription to Wire Services.* The 1976 *Enquirer* did not subscribe to the Associated Press or United Press International news services, but did subscribe to Reuters News Service. No new evidence is presented regarding 2001 subscriptions to wire services.

2) *Attribution of Content to Wire Services.* The 1976 *Enquirer* did not attribute content to wire services. The

present record includes seven issues of the *Enquirer* published in 2001.[5] There is no attribution of content to wire services. *See,* Doc.30, Exhs. 3–6; Doc.35, Exhs. D–F. There is no evidence of change in the use of wire services.

3) *Current Coverage of Politics, Sports and Crime.* The 1976 *Enquirer* provided little or no current coverage of subjects such as politics, sports or crime. The record includes the two 1976 issues of the *Enquirer* which formed the basis for the determination in *Burnett* that the publication was not a section 48a newspaper. *See* Doc.30, Exhs. 1–2. Each 1976 issue contains between five and ten stories that can reasonably be classified as political coverage. *See, e.g.,* Doc.30, Exh. 1 at pp. 7, 14, 34, 44, 55, 60, 64. Most of these stories do not identify specific dates, nor is it possible to identify exactly how "current" the coverage is. The seven 2001 issues reveal approximately three stories per issue that can reasonably be classified as coverage of politics, sports or crime. Most stories contain only general references to dates and times, but at least some of the criminal stories contain coverage which could be called "current," at least within the past two weeks. *See, e.g.,* Doc.35, Exh. D at pp.32–33 (August 14, 2001, issue of the *Enquirer* featuring a story on Ms. Levy's disappearance including a timeline through July 27, 2001). Most of the stories in issues from 1976 and 2001 cannot reasonably be classified as "current coverage of politics, sports or crime."

4) *References to Time.* The 1976 *Enquirer* stories did not generally make reference to time. Nor do the 2001

---

**5.** The seven issues of the *Enquirer* from 2001 in the record bear the following publication dates: 1) February 27, 2001; 2) May 8, 2001; 3) May 29, 2001; 4) August 7, 2001; 5) August 14, 2001; 6) August 21, 2001; 7) August

28, 2001. *See* Doc. 30, Exhs. 3–6; Doc. 35, Exhs. D–F. The two issues from 1976 in the record bear publication dates of February 17, 1976, and March 2, 1976. *See* Doc.30, Exhs. 1–2.

*Enquirer* issues generally make reference to time. *See, e.g.,* Doc.30, Exhs. 3–6; Doc.35, Exhs. D–F. When dates are mentioned, they are frequently more than one week in the past. *See, e.g.,* Doc.35, Exh. D (August 14, 2001, edition, referring to an event as having occurred on July 23).

5) *Day–to–Day Generation of Stories.* The 1976 *Enquirer* did not generate stories day to day as a daily newspaper does. The only evidence presented as to the 2001 *Enquirer's* generation of stories is Defendant's response to Plaintiff's Interrogatory No. 7 (Second), which asks, "Exactly what date did National Enquirer, Inc. first obtain the information that Carolyn Condit had a 'furious phone call' with Chandra Levy?" Defendant responded: "On or about July 21, 2001, but in any event between the dates of July 17 and July 23, 2001, the latter date being the submission deadline date for the August 7, 2001 edition." *See* Doc.30, Exh. 7. At minimum, according to Defendant, the story which gave rise to the First and Second Offending Statements, one of the "breaking news stories" referred to by Defendant as an example of the *Enquirer's* new focus on "current coverage of crime," was generated in three days. The *Enquirer* is still a weekly publication. Defendant has not submitted evidence that comes close to preponderating that it publishes under time pressure.

6) *Lead Time.* The 1976 *Enquirer* had a lead time for its stories of one to three weeks. In a footnote in its Reply Brief, Defendant infers from an answer to Plaintiff's Interrogatory No. 7 (Second)

that the "lead time" for the current *Enquirer* is three days. *See* Doc.34 at p.4 n. 6 (citing Doc.30, Exh. 7).

The seven 2001 *Enquirer* issues contain stories that focus on "interesting facts" about stories from past years; stories condensed from books; regular features such as "All the Buzz," "All the Gossip," and "Planet Tabloid"; stories based on photographs; solicitations for stories and comments; puzzles and quizzes; and stories based on interviewed sources. *See* Doc.30, Exhs. 3–6; Doc.35, Exhs. D–F. The evidence adduced does not establish the news dissemination function of the *Enquirer* of 2001 is so "markedly different" from the *Enquirer* of 1976 as to justify a departure from *Burnett* to find the *Enquirer* is now a section 48a "newspaper." The evidence does not establish the 2001 *Enquirer* is materially different from the *Enquirer* of 1976 in the areas of wire service subscriptions and attributions, story references to time, and day-to-day generation of stories. While the evidence shows the 2001 *Enquirer* includes more crime stories than the 1976 *Enquirer*, the overall coverage of politics, sports and crime is comparable, if not less, from 1976. There is some indication that the coverage of politics, sports and crime in the *Enquirer* of 2001 is more "current" than in the *Enquirer* of 1976. The lead time of the *Enquirer* of 2001 for the disputed stories is said to be three days,[6] contrasted with the 1976 story lead time of one to three weeks.

Even assuming shortened lead time and slightly more current coverage in the 2001 *Enquirer* for some stories, the *Enquirer's* overall content establishes it is a publication whose primary focus is not "the very

---

**6.** This inference is based upon an interrogatory answer in which it was stated the information about the "furious phone call" was obtained between July 17 and July 23 and the fact that the August 7, 2001, issue was pub-

lished July 26, 2001. *See* Doc.30, Exh. 7. These facts are equally susceptible to the inference that the lead time, reported as a range (one to three weeks) in *Burnett,* was at least three to nine days for the 2001 *Enquirer.*

free and *rapid* dissemination of news [section 48a] seeks to encourage." *Field Research Corp. v. Sup.Ct.,* 71 Cal.2d 110, 115, 77 Cal.Rptr. 243, 453 P.2d 747 (1969) (emphasis added). The record does not evidence the *Enquirer* is "under pressure to disseminate 'news while it is news.'" *Alioto v. Cowles Comm., Inc.,* 519 F.2d 777, 779 (9th Cir.1975). Nor does it publish news under circumstances where it cannot confirm the accuracy and reliability of its information and sources. Rather the *Enquirer* appears to "have the advantage of greater leisure in which to ascertain the truth of allegations before publishing them." *Id.*

The fact that the *Enquirer* now maintains a website as an alternative forum for publishing its content does not transform it into a "newspaper" under pressure to publish news before having time to more thoroughly investigate the accuracy of its stories. *See* Doc.19 at p.10:8–12. The website provides information in a continuously available electronic context that permits "on-line" update and revision capability. As Defendant acknowledged at argument, once a story is posted to the website, it is no longer "hot" or a first exclusive and website posting undercuts the exclusivity and temporal priority of the print edition. Existence of the website does not necessarily increase the pressure for more rapid dissemination without information and source investigation or accuracy confirmation.

The protections afforded by section 48a are limited to publications which engage in the *immediate* dissemination of news based on the legislative policy that "current news" enterprises "are most often subject to unwarranted claims for excessive damages in defamation suits, that they cannot always check their sources for accuracy and their stories for inadvertent publication errors, and that such enterprises are peculiarly well situated to publish effective retractions." *Field Research,* 71 Cal.2d at 114, 77 Cal.Rptr. 243, 453 P.2d 747. When the *Enquirer* rushes a story into its publication without checking for accuracy, it does so as a publication which has been judicially characterized as a "sensationalist tabloid," *see Eastwood v. Nat'l Enquirer,* 123 F.3d 1249, 1256 (9th Cir.1997); that does not generally reference time; does not "disseminate" news gathered from and attributed to wire services; post-dates its issues by at least a week; and relies primarily on "newsworthiness" aspects of its stories such as readership interest and visibility in the media rather than timeliness in determining what to publish, *see Burnett,* 144 Cal.App.3d at 1004 & n. 6, 193 Cal.Rptr. 206. The evidence shows a distinct lack of emphasis on the timeliness of news reported by the *Enquirer,* which militates against a finding that the *Enquirer* is the type of time-driven publication ("newspaper") the legislature enacted section 48a to afford special protection in weighing the balance between timeliness and accuracy in news dissemination.

In a footnote, and more extensively at oral argument, Defendant contends that its publication, which "regularly publishes breaking news," should be afforded the section 48a protections without regard to the proportion of the publication devoted to such recent events. *See* Doc.34 at p.8 n. 11. Section 48a contemplates a publication-based, rather than an article-based, determination of what qualifies as a "newspaper." *See, e.g., McCoy v. Hearst Corp.,* 220 Cal.Rptr. 848, 870 n. 18 (1985) (rejecting in dicta an approach to section 48a that would strip newspapers of 48a's protection for "long term investigatory articles" in which time for source-checking is more plentiful on the ground "the statute does not make this distinction"), *rev'd on other grounds,* 42 Cal.3d 835, 231 Cal.Rptr. 518, 727 P.2d 711 (1986). In determining whether a publication fulfills the "role . . .

of disseminating breaking news" worthy of protection under the statute, *see In re Cable News Network,* 106 F.Supp.2d at 1001 n. 2, the proportion of the publication dedicated to the timely dissemination of news is relevant. Defendant claims it has occasionally published significant breaking news stories. *See* Doc.22 at ¶¶ 5–10, Exh. B. " 'There is a significant difference, however, between one who occasionally discovers and makes public an item that is newsworthy and one who, as a daily occupation or business, collects, collates, evaluates, reduces to communicable form, and communicates the news. It is these latter activities that the Legislature sought to protect by section 48a." ' *Denney v. Lawrence,* 22 Cal.App.4th 927, 938, 27 Cal.Rptr.2d 556 (1994) (quoting *Field Research Corp. v. Sup.Ct.,* 71 Cal.2d 110, 115–16, 77 Cal. Rptr. 243, 453 P.2d 747 (1969)).

While the *Enquirer,* unlike the individuals who sought section 48a protection in *Denney* and *Field Research,* is engaged in a publication enterprise effectively able to print retractions in subsequent issues, section 48a coverage extends only to those whose daily occupation it is to communicate the news rapidly. That the *Enquirer* may be "peculiarly well situated to publish effective retractions," *see Field Research,* 71 Cal.2d at 114, 77 Cal.Rptr. 243, 453 P.2d 747, is a necessary prerequisite to protection under section 48a, but it is not conclusive. Otherwise section 48a would extend protection to all periodicals regardless of their role as rapid disseminators of news, a result unsupported by either the language of section 48a, its legislative history, or the caselaw. That it publishes only a very small proportion of its stories on as short as three-days' notice does precludes the *Enquirer's* transformation into the type of news publication the legislature identifies as furthering the public interest in rapid news dissemination. Defendant well understands what it takes to be a "newspaper" under the statute. It has purposefully chosen not to fulfill the role of a current news disseminator and instead to reach a different audience with different expectations, from those who read daily "newspapers" that predominantly disseminate current ("hot") news.

The record is devoid of evidence that the business mode or publication process of the *Enquirer* is focused on daily, fast-breaking news. Even if the *Enquirer* of 2001 regularly publishes some timely news coverage of politics, crime, and sports, Defendant's evidence does not warrant departure from *Burnett.* Although " '[t]he lines continue to blend' between news and gossip, tabloids and the mainstream print media," *see* Ann O'Neill and Martin Miller, *Enquiring Minds Bow to National Enquirer Scoops . . .,* LOS ANGELES TIMES, Feb. 23, 2001, at A20, Defendant has not met the burden to show the character of the *Enquirer* has so changed that its publication mission is to disseminate current news which prevents it from checking for accuracy and publication error.

### 4. *Evaluation of Content*

Defendant correctly asserts the evaluation of the *Enquirer* as a newspaper must be content-neutral. *See* Doc.19 at pp.10–11; Doc.34 at pp.7–8. The *Burnett* factors determine newspaper status under section 48a, "in terms which justify an expanded barrier against damages for libel in those instances, and those instances only, where the constraints of time as a function of the requirements associated with the production of the publication dictate the result." *Burnett,* 144 Cal.App.3d at 1004, 193 Cal. Rptr. 206; *see also id.* at 1004 n. 6, 193 Cal.Rptr. 206 ("In so saying we are mindful of the semantic and substantive difficulties inherent in the use, in the present context, of such words as 'immediate' ('timely') and 'news,' it being the case that the former might be seen as a function of occurrence, or of discovery, or something else and the latter may be regarded as the

product of the media, or as dependent for its definition upon the perception of its recipient or delineated in some other fashion.") (citations omitted). *Burnett* recognized and took pains to ensure that the criteria for newspaper status did not depend on content-based notions of "newsworthiness." *See, e.g., Solano v. Playgirl, Inc.,* 292 F.3d 1078, 1089 n. 8 (9th Cir. 2002) (" 'Courts are, and should be, reluctant to define newsworthiness.' ") (quoting *Lerman v. Flynt Distrib. Co., Inc.,* 745 F.2d 123, 138–39 (2nd Cir.1984)). The characterization of the *Enquirer*'s contents as "sensationalist tabloid journalism" if different from "mainstream news" is not determinative. *See Desnick v. Amer. Broad. Cos.,* 44 F.3d 1345, 1355 (7th Cir. 1995) (tabloid journalism entitled to all safeguards surrounding liability for defamation).

### 5. *Frequency of Publication*

Defendant cites several cases to support its contention that section 48a does not automatically exclude from its protection, publications that are produced weekly, or monthly, instead of daily. *See* Doc.19 at p.9:25–28. *In re Cable News Network* held, with "reservations," that *Time* magazine, a weekly publication, was protected under section 48a, but only because the plaintiff alleged the article at issue in *Time* was prepared as part of a "single package" with a television broadcast. *See In re Cable News Network,* 106 F.Supp.2d at 1002 ("It would be inconsistent to impose the special damages limitation of section 48a to claims based directly on the CNN broadcasts but not to claims dependent upon the same broadcasts."). The legislature intended section 48a "to protect purveyors of breaking news." When the statute was amended to cover television broadcasts, the legislature "likely had not even contemplated magazine-style broadcasts such as those at issue." The court applied section 48a to the CNN broadcasts

only "because the plain statutory language makes section 48a applicable to all television broadcasts." *In re Cable News Network,* 106 F.Supp.2d at 1002. Since the Time magazine article was prepared as part of the same package under plaintiff's own theory, "the Court conclude[d] that under the specific circumstances of this case it has no choice but to apply section 48a to the article as well." *Id.* The unique circumstances of *In re Cable News Network* are not present here.

In *Gomes v. Fried,* 136 Cal.App.3d 924, 186 Cal.Rptr. 605 (1982), a pre-*Burnett* decision, section 48a was applied to a weekly newspaper without any analysis whether the weekly publication was a "newspaper" for purposes of the statute. The statute was similarly applied to a weekly business newspaper in *Brooks v. Physicians Clinical Lab. Inc.,* 2000 WL 336546, 2000 U.S. Dist. Lexis 13603 (E.D.Cal.2000), without analysis or acknowledgment of the issue. *See also Maidman v. Jewish Publications, Inc.,* 54 Cal.2d 643, 654, 7 Cal.Rptr. 617, 355 P.2d 265 (1960) (pre-*Burnett* decision apparently applying section 48a to a weekly newspaper, without discussion about whether it was a "newspaper" within the meaning of section 48a). *Briscoe v. Reader's Digest Ass'n, Inc.,* 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (1971), applied section 48a to a monthly publication. *Burnett* extensively analyzed and found *Briscoe* lacked "any discussion of the reasons upon which the holding is based." *Burnett,* 144 Cal. App.3d at 1003, 193 Cal.Rptr. 206; *see also Briscoe,* 4 Cal.3d at 543 & n. 20, 93 Cal. Rptr. 866, 483 P.2d 34; *see also Fellows v. Nat'l Enquirer, Inc.,* 42 Cal.3d 234, 242–43, 228 Cal.Rptr. 215, 721 P.2d 97 (1986) (citing *Briscoe* for the proposition that section 48a's defamation restrictions apply to an invasion of privacy claim).

None of these cited cases contradicts *Burnett's* fundamental holding that section

48a protection is limited to "those who engage in the immediate dissemination of news ... and cannot always check their sources for accuracy and their stories for inadvertent publication errors." *Burnett,* 144 Cal.App.3d at 1004, 193 Cal.Rptr. 206 (citation omitted). In each of the California Supreme Court and Appellate cases relied on by Defendant (*Maidman, Briscoe, Fellows, Gomes, Brooks*), the court simply assumed section 48a applied, without discussion or analysis of the issue.

■■■ "Such unstated assumptions on non-litigated issues are not precedential holdings binding future decisions." *Sorenson v. Mink,* 239 F.3d 1140, 1149 (9th Cir.2001) (citing *Sakamoto v. Duty Free Shoppers, Ltd.,* 764 F.2d 1285, 1288 (9th Cir.1985)); *see also Estate of Magnin v. Commissioner,* 184 F.3d 1074, 1077 (9th Cir.1999) ("When a case assumes a point without discussion, the case does not bind future panels."). Even if the holdings in those cases were binding precedent on the issue of what constitutes a newspaper, they would be of no help here because they contain no analysis or useful discussion to guide the application of 48a.

Defendant argues "limiting the application to daily newspapers would render unprotected the 476 non-daily newspapers published in California;" Doc.19 at p.10:3–4, and weekly publications, including the *Enquirer,* are covered under the statute. The periodicity of a publication (daily, weekly, bi-weekly, monthly) is relevant to the extent that publications with longer periods between issues may find it more difficult to survive in the capacity of a disseminator of "news while it is new." Understanding what is meant by the term "news," in the sense relevant to the 48a "newspaper" inquiry, is aided by reference to the commonly accepted definition of the term: "A report of recent occurrences; information of something that has lately

taken place, or of something before unknown; fresh tidings; recent intelligence." *See* <http://www.dictionary.com>. Daily newspapers have an inherent advantage over weekly publications in the rapid dissemination of news so-defined. The 24–hour period of dailies allows them to function as a comprehensive source for breaking news.

A weekly publication cannot disseminate news until one week after its last issue is published. Any breaking news that occurs during the week will appear first in daily periodicals or on websites. Weekly publications that strive to disseminate "news while it is new" in competition with daily newspapers do so understanding the natural advantage dailies have. To compensate for its longer publication periods, a weekly publication which aims to "engage in the immediate dissemination of news," *see Burnett,* 144 Cal.App.3d at 1004, 193 Cal.Rptr. 206, may continue to develop stories which broke during the week in more depth and with new information gathered up until a very short time before publication. Such a publication, consisting of a comprehensive collection of the week's news stories, each containing a mixture of information gathered throughout the week, may qualify for protection under section 48a despite its weekly cycle.

The evidence submitted does not reveal the *Enquirer* is such a publication. Defendant does not dispute the predominant content of its publication can in no way be deemed current or time-driven coverage of crime, politics, foreign affairs, or sports. There are no attributions to wire services. Many of its stories feature events or facts which transpired or were uncovered months or years in the past. References to time are generally absent, and when present, are often general expressions such as "recently" or "currently." The fact that Defendant offers only a handful of purportedly significant, breaking news

stories published in the *Enquirer* over the past decade is revealing. Each party had full opportunity to develop the evidentiary record for this motion.

As Plaintiff observes, merely being the first to report a few stories over a decade does not convert the *Enquirer* into a disseminator of "breaking news." *See* Doc.28 at p.11:9–10. Defendant's evidence does not prove it strives to fulfill the role of a disseminator of "new news." Its focus remains on filling its publication with a certain category of content—gossip, celebrities, entertainment, scandal, and the unusual—rather than the immediate distribution of the week's news, comprehensively collected and covered, continuously researched until the time of publication. Such a publication is not within section 48a protection. The *Enquirer*'s weekly publication cycle is relevant to its reporting focus which is different from daily newspapers. Periodicity of publication alone is not determinative. Rather, the absence of temporal factors in the *Enquirer*'s mode of publication, shows it is not focused on and reporting current news under time constraints, and is not a section 48a "newspaper."

### 6. *Stare Decisis*

 In the absence of clear California law, a federal court "must predict as best [it] can what the California Supreme Court would do in these circumstances." *Pacheco v. United States*, 220 F.3d 1126, 1131 (9th Cir.2000). Only if there is no precedent, does a federal court need to predict state law. "The duty of the federal court is to ascertain and apply the existing California law, not to predict that California may change its law." *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1479 (9th Cir.1995). After *Burnett*, the Califor-

nia Supreme Court has not substantively addressed the issue of what qualifies as a "newspaper" under section 48a. *Burnett* is a California Court of Appeal decision. California appellate court decisions are persuasive precedent, but a federal court is not bound by them if it believes that the California Supreme Court would decide otherwise. *See Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 41 F.3d 429, 432 (9th Cir. 1994).

*Burnett* is well-reasoned, comprehensive in its analysis of prior California Supreme Court cases, and has not been overruled by subsequent California Supreme Court cases, none of which address the jurisprudence of what constitutes a "newspaper" under section 48a. *Burnett* remains the last authoritative expression of California state law directly and specifically addressing the issue. As such, it is persuasive precedent and binding authority on this court, as both parties agree. *See Werner v. Hearst Publishing Co.*, 297 F.2d 145, 148 (9th Cir.1961) ("the latest expression of the law of the State by an appellate State Court (albeit a court of intermediate appellate jurisdiction), . . . is binding upon us"); Doc.34 at p.1:6–9 ("It is also not disputed that this Court is bound by the decisions of California's appellate courts that have interpreted and construed Cal. Civ.Code § 48a, including *Burnett* . . ., and that the law has not changed since *Burnett* was decided."). Moreover, Defendant has not argued that *Burnett* is not the law or should be changed. Rather, Defendant argues that the *Enquirer*, as a "news" publication, has changed.

For all these reasons, the 2001 *Enquirer* is not a section 48a newspaper. Plaintiff was not required to comply with section 48a requirements in initially prosecuting her libel claims against Defendant.[7] De-

---

**7.** Plaintiff's argument that plaintiff could not be expected to comply with § 48a because she relied that *"Burnett* was the law," is a non-

starter, in view of her counsel's admission compliance was not effected because she did

fendant's motion to dismiss, or alternatively, for summary judgment, on the ground Plaintiff failed to comply with California Civil Code section 48a is DENIED.

### C. *Defamatory Meaning*

Defendant moves to dismiss Plaintiff's claims on the ground the Offending Statements are not reasonably susceptible of a defamatory meaning. *See* Doc.19.

California Civil Code section 45 provides:

> Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.

Cal. Civ. § 45.

██ A defamatory publication not libelous on its face is not actionable unless the plaintiff alleges that she has suffered special damages as a result thereof. *See* Cal. Civ. § 45a; *see also* Cal. Civ. § 44 ("Defamation is effected by ... libel."). Libel on its face, or libel per se, is distinguished from libel not defamatory on its face, or libel per quod, in California Civil Code section 45a. Libel on its face is defined as "[a] libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact." Cal. Civ. § 45a.

██ "The initial determination as to whether a publication is libelous on its face, or libelous per se, is one of law." *Selleck v. Globe Int'l, Inc.,* 166 Cal.App.3d 1123, 1132, 212 Cal.Rptr. 838 (1985). "It is error for a court to rule that a publication cannot be defamatory on its face when by any reasonable interpretation the language is susceptible of a defamatory meaning."

*Selleck,* 166 Cal.App.3d at 1131, 212 Cal. Rptr. 838. A defamatory meaning must be found, if at all, in a reading of the publication as a whole. *See Kaelin v. Globe Comms. Corp.,* 162 F.3d 1036, 1040 (9th Cir.1998). "California courts in libel cases have emphasized that the publication is to be measured, not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." *Kaelin,* 162 F.3d at 1040 (citations and alterations omitted). "So long as the publication is reasonably susceptible of a defamatory meaning, a factual question for the jury exists." *Id.* (citations and alterations omitted).

#### 1. *First Offending Statements*

██ Defendant contends the First Offending Statements, considered in the context of the article as a whole, are not reasonably susceptible of a defamatory meaning. *See* Doc.19 at p.13:8–11. Plaintiff rejoins the First Offending Statements are reasonably susceptible to three different defamatory meanings: 1) Plaintiff physically attacked Ms. Levy; 2) Plaintiff was hiding information or had something to do with Ms. Levy's disappearance; and 3) Plaintiff "flew into a rage" and had a "furious" phone conversation with Ms. Levy just days before her disappearance. *See* Doc.28 at p.16:9–20; Complaint at ¶ 17.

██ The First Offending Statements were published in the midst of a media frenzy and an ongoing investigation into the disappearance of Ms. Levy. Defendant contends there was "no public understanding of what happened to Chandra Levy" when the First Offending Statements were published. *See* Doc.19 at p.14:8–9. However, there was a public understanding Ms.

not consult counsel until after the 20 day

period ran.

Levy was missing. The First Offending Statements, particularly the all-caps cover headline, "COPS: CONDIT'S WIFE ATTACKED CHANDRA," may reasonably be interpreted as imputing the commission of a crime (*e.g.*, murder, battery, and/or assault) to Plaintiff. The sub-headline, "What wife is hiding," is reasonably susceptible of the interpretation that Plaintiff is obstructing justice or hiding information about her own involvement or first-hand knowledge about Ms. Levy's disappearance. Statements which falsely impute the commission of a crime are libelous on their face. *See Snider v. Nat'l Audubon Soc'y, Inc.,* 1992 WL 182186, at *4, 1992 U.S. Dist. Lexis 10017, *12 (E.D.Cal.1992) (denying motion to dismiss where "the clear implication from the article is that plaintiff is being investigated by the I.R.S."); *Barnes–Hind, Inc. v. Sup.Ct.,* 181 Cal. App.3d 377, 385, 226 Cal.Rptr. 354 (1986) ("Perhaps the clearest example of libel per se is an accusation of crime."); *Plumb v. Stahl,* 54 Cal.App. 645, 646, 202 P. 468 (1921) ("it has always been held that it is libel per se to charge a person with the commission of a crime involving moral turpitude"). The First Offending Statements are reasonably susceptible of a defamatory meaning which exposes Plaintiff to hatred, contempt, and ridicule by virtue of the susceptibility of the published words' being understood to report Plaintiff attacked Chandra Levy; engaged Chandra Levy in a furious phone call "screamfest"; had information about Chandra Levy she was hiding; is an angry, jealous, betrayed spouse who had a motive to see that Chandra Levy disappeared; and had information about the disappearance Plaintiff wrongfully refused to provide to the police. Whether such statements were so understood by an ordinary reader is a jury question.

Defendant contends the verb "attacks" in the cover page headline "carries a broad range of possible meanings," some of which are not defamatory. *See* Doc.19 at p.13:11–23. Even assuming, *arguendo,* there are non-defamatory readings of the word "attacks" in the context of the headline, all that the law requires is that the headline is reasonably susceptible to one defamatory meaning. *See Kaelin,* 162 F.3d at 1040; *Williams v. Daily Review, Inc.,* 236 Cal.App.2d 405, 410, 46 Cal.Rptr. 135 (1965) ("language may be libelous on its face even though it is susceptible of an innocent interpretation"), *overruled on other grounds by Brown v. Kelly Broadcasting Co.,* 48 Cal.3d 711, 735–36, 257 Cal.Rptr. 708, 771 P.2d 406 (1989).

Defendant contends the subheading, "the furious phone call," "makes clear that the alleged 'attack' occurred in the course of 'the' telephone conversation, and could not, therefore, be a physical attack." Doc.19 at p.14:1–2. While a reader might infer from the presence of the sub-headline, "the furious phone call," that the attack was verbal rather than physical, others could reasonably not draw such an inference. The cover headlines taken together are reasonably susceptible to a defamatory meaning.

In *Kaelin,* the following headline, published by Globe Communications Corporation ("Globe") in the *National Examiner* one week after O.J. Simpson was acquitted of the murders of Nicole Brown Simpson and Ronald Goldman, was held to be reasonably susceptible of a defamatory meaning: "COPS THINK KATO DID IT! / ... he fears they want him for perjury, say pals." *See Kaelin,* 162 F.3d at 1042. The cover article began on page 17 of the publication and stated that Kaelin was suspected of perjury for not revealing everything he knew. *See Kaelin,* 162 F.3d at 1038. Globe argued that even if the front page headline could be found to be false and defamatory, the totality of the publication was not. Globe's position was that be-

cause the text of the accompanying story is not defamatory, the headline by itself could not be the basis for a libel action under California law. *See Kaelin,* 162 F.3d at 1040. *Kaelin* held that "a court must examine the totality of the circumstances of the publication." *Kaelin,* 162 F.3d at 1041. "This is a rule of reason. Defamation actions cannot be based on snippets taken out of context. By the same token, not every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action." *Kaelin,* 162 F.3d at 1040.

Defendant argues that false statements that are "innocuous" are not actionable because they are not at odds with the moral expectations of the community. *See Selleck,* 166 Cal.App.3d at 1132, 212 Cal. Rptr. 838. *Kaelin* held that since the publication appeared one week after the acquittal of O.J. Simpson, a reasonable person could have concluded the word "it" in the headline referred to the murders of Nicole Brown Simpson and Ronald Goldman. *See Kaelin,* 162 F.3d at 1040. The follow-on phrase, "he fears they want him for perjury, say pals," did not negate such an interpretation, the headline was reasonably susceptible of a defamatory meaning. *See id.* Whether or not the entirety of the publication, including the cover story published on page 17, remedied any false and defamatory meaning gleaned from the front-page headlines was a matter of fact for the jury to determine. *See Kaelin,* 162 F.3d at 1041.

Defendant contends the text of the article, 32 pages removed from the cover, negates any defamatory meaning which could be inferred from the headlines. *See* Doc.19 at p.15. The article's headline in all-caps is "COPS: CONDIT'S WIFE ATTACKED CHANDRA," followed underneath and to the right in a box by the sub-headline, "Explosive phone call before intern vanished." A caption above the main headline and underneath a photograph of Plaintiff reads: "Bitter Carolyn Condit flew into a rage at Chandra during a no-holds-barred phone call." The first paragraph reads, "Gary Condit's bitter wife flew into a rage and attacked Chandra Levy in a furious confrontation just days before the intern's disappearance, the *Enquirer* has learned exclusively." The next paragraph states: "In a major breakthrough, investigators have uncovered what they say is 'the blowup phone call' between Chandra and Carolyn Condit—during which the 24–year–old intern told an enraged Carolyn that Gary was dumping her to start a new life and family with Chandra." The final partial paragraph on page 32, continuing onto page 33, states: "The source close to the case added: 'No one is suggesting Carolyn is guilty of anything—but investigators believe she could be the key to learning the events that may have precipitated Chandra's disappearance.'" Complaint, Exh. 1. All these statements were published at the time the disappearance was disclosed and did not refer to stale events in a way that would communicate they did not mean to suggest Plaintiff had any role in Ms. Levy's disappearance.

Defendant contends the references to the phone call clarify the "attack" was verbal rather than physical, and the statement that Plaintiff was not being accused of anything negates the implication Plaintiff committed a crime. *See* Doc.19 at p.15. The situation was similar in *Kaelin,* where Globe argued the story cleared up any false and defamatory meaning that could be found from the cover:

Whether it does or not is a question of fact for the jury. The Kaelin story was located 17 pages away from the cover. In this respect, the National Examiner's front page headline is unlike a conventional headline that immediately precedes a newspaper story, and nowhere

does the cover headline reference the internal page where readers could locate the article. A reasonable juror could conclude that the Kaelin article was too far removed from the cover headline to have the salutary effect that the Globe claims.

*Kaelin,* 162 F.3d at 1041.

Here, the cover headlines here are separated from the article by 32 pages, almost twice as far removed as the article at issue in *Kaelin,* without any reference to the internal page where the cover story can be found. The headlines on page 32 and the first paragraph of the article are all reasonably susceptible to the interpretation that Plaintiff physically attacked Ms. Levy. One sentence that discusses the "attack" makes no reference to a phone call. Whether or not the remainder of the article clears up any false and defamatory meaning, as to the nature and number of any attack(s), that may be inferred from the article as a whole is a question of fact for the jury. The phrase, "No one is suggesting Carolyn is guilty of anything," does not cure the article's language, which is ambiguous and invites the reader to inquire, "guilty of what?", "suggested by whom?", and "if not now, when?". None of the references in the article addresses the reasonable interpretation, susceptible of a defamatory meaning, that Plaintiff was hiding information about Ms. Levy's disappearance.

Defendant's motion to dismiss the Complaint's first claim on the ground the First Offending Statements are not reasonably susceptible to a defamatory meaning is DENIED.

2. *Second and Third Offending Statements*

 Defendant moves to dismiss Plaintiff's second and third claims on the ground the Second and Third Offending Statements are not reasonably susceptible

of a defamatory meaning. *See* Doc.19 at p.16:14–15. Defendant contends a person "in Mrs. Condit's position is no less well-thought-of for expressing anger at her husband's paramour, nor for fighting to maintain the integrity of the family unit.... [N]o one who read the story and believed those allegations to be truthful would lower his or her estimation or opinion of Mrs. Condit." Doc.19 at p.16:17–21. Defendant contends the account of the phone call was "innocuous" because it did not involve conduct at odds with the moral expectations of the community. *See* Doc.34 at p.10:21–23. This partial analysis is misleading and incomplete as it fails to search the published words for alternative defamatory interpretations as is required under the law.

 Unlike *Selleck, Eastwood,* and *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991), on which Plaintiff relies, the articles, subject of the second and third claims, do not state or insinuate Defendant interviewed Plaintiff. *See* Doc.28 at pp.17–19. "False attribution of statements to a person may constitute libel, if the falsity exposes that person to an injury comprehended by the statute." *Masson,* 501 U.S. at 510, 111 S.Ct. 2419 (citing, *inter alia, Selleck,* 166 Cal.App.3d at 1132, 212 Cal. Rptr. 838 ("Falsely ascribing statements to a person which would have the same damaging effect as a defamatory statement about him is libel.")). In *Masson* the fact the statements attributed to the plaintiff were placed within quotation marks was found misleading. *See Masson,* 501 U.S. at 511–12, 517, 111 S.Ct. 2419 ("quotations may be a devastating instrument for conveying false meaning"). Here, no actual words purportedly spoken by Plaintiff were placed in quotation marks in the offending articles. *Cf. Bindrim v. Mitchell,* 92 Cal.App.3d 61, 155 Cal.Rptr. 29

(1979) (publication attributing profane words to plaintiff (through a thinly veiled fictional character) held to be defamatory). The articles do not "quote" or paraphrase the words purportedly spoken by Plaintiff to Ms. Levy during the "furious phone call." The article in the issue dated August 7, 2001, paraphrases some of what Ms. Levy purportedly said to Plaintiff, but none of what Plaintiff purportedly said in response. Plaintiff does not allege the Second and Third Offending Statements are defamatory because of any statements the *Enquirer* reported Plaintiff uttered during the "furious phone call." Rather, Plaintiff alleges the statement that any such call occurred and that it was made in a furious, enraged, bitter manner is false and defamatory.

Plaintiff's cases refer to language which tended to injure individuals in their occupations. *See, e.g., Cepeda v. Cowles Magazines & Broad., Inc.,* 328 F.2d 869, 870 (9th Cir.1964) (published statements, including that Cepeda was "temperamental, uncooperative and underproductive[,] ... would tend to injure Cepeda in his occupation [as] a notable baseball player"); *Walker v. Kiousis,* 93 Cal.App.4th 1432, 114 Cal.Rptr.2d 69 (2001) (report that plaintiff police officer used profanity and made threats during a traffic stop of a courteous citizen tends to injure plaintiff in his occupation); *Kapellas v. Kofman,* 1 Cal.3d 20, 81 Cal.Rptr. 360, 459 P.2d 912 (1969) (editorial opposing plaintiff's candidacy for city council stating her children were delinquents and implying she was unfit to be a mother or a city councilwoman tends to injure her in her desired occupation); *Maidman,* 54 Cal.2d 643, 649, 7 Cal.Rptr. 617, 355 P.2d 265 (editorial injured plaintiff in his position of prominence as chairman of a Southern California Jewish organization).

Plaintiff's contention that the Second and Third Offending Statements are rea-sonably susceptible of a defamatory meaning because they imply marital discord fails. In *Time, Inc. v. Firestone,* 424 U.S. 448, 458, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), a report that allegedly falsely stated the plaintiff committed adultery and cruelty toward her husband was found reasonably susceptible of a defamatory meaning. No report of such conduct on the part of Plaintiff is contained in the Second and Third Offending Statements. Neither do the Offending Statements report or suggest Plaintiff engaged in the kind of immoral or improper marital conduct. *See Gariepy v. Pearson,* 207 F.2d 15 (D.C.Cir. 1953) (broadcasts that money was paid to husband by another man for "alienation of affection" might reasonably be understood as implying that plaintiff was an unchaste wife); *Thackrey v. Patterson,* 157 F.2d 614, 615 (D.C.Cir.1946) (defamatory meaning possible in report stating plaintiff wife bought her husband with money, found him disappointing as an editor and inadequate as a husband, and desired a different man). Immoral conduct in the marriage is not attributed to Plaintiff.

"The code definition of libel is very broad and has been held to include almost any language which, upon its face, has a natural tendency to injure a person's reputation, either generally, or with respect to his occupation." *MacLeod v. Tribune Publishing Co.,* 52 Cal.2d 536, 546, 343 P.2d 36 (1959). This includes a meaning which could expose Plaintiff to injury to reputation by attributing to Plaintiff the appearance of negative personal traits or attitudes the person does not possess. *See Masson,* 501 U.S. at 517, 111 S.Ct. 2419. The article in the August 17, 2001, issue reports that when Plaintiff called her husband's apartment, Ms. Levy answered the phone and proceeded to tell Plaintiff that her husband "Gary was dumping her to start a new life and family with Chandra." Complaint, Exh. 1. That Plaintiff purport-

edly became upset, enraged, and engaged in "a heated phone screamfest" with Ms. Levy, if false, attributes to Plaintiff a bitter and angry disposition, intemperance, and loss of control, which are traits that could subject Plaintiff to contempt, opprobrium, ridicule, and humiliation if she was unable to deal with the matter in a rational and reasonable manner. It is only necessary that some could view Plaintiff with contempt, ridicule, obloquy or avoidance, although others might react differently to the articles' portrayal of Plaintiff.

Defendant argues that any reasonable person could expect an angry, emotional outburst from a wife who, upon calling her husband's apartment on the opposite side of the country, reaches a young female intern who answers the phone, who allegedly proceeds to disclose that the caller's husband is in love with the intern and "was dumping her to start a new life and family with Chandra." However, the reported "fact" that a phone call occurred during which Plaintiff manifested rage and exchanged "heated" words at high volume with Ms. Levy, could falsely convey to the reader that Plaintiff is an intemperate hothead who engaged in a screamfest on a long distance phone call with a person she did not know, when prudence dictated terminating that call and not "losing her temper." Such conduct could cause others to have contempt for, to ridicule, shun or avoid Plaintiff, making the statements reasonably susceptible to a defamatory meaning.

The Second and Third Offending Statements may also be reasonably susceptible of a defamatory meaning to the extent they tend to support or lend context to the First Offending Statements' implication that Plaintiff physically attacked Ms. Levy, had something to do with Ms. Levy's disappearance, or that Plaintiff was hiding information relevant to Ms. Levy's disappearance. The Second and Third Offending Statements communicate or imply that Plaintiff was very upset with Ms. Levy "just days before" Ms. Levy's disappearance. The August 7, 2001, article later states: "After the explosive call, a fuming Carolyn whisked off to Washington, D.C., on April 28" where she remained in her husband's apartment until May 3. *See* Complaint, Exh. 1. In the context of the First Offending Statements and the rest of the article, the Second Offending Statements link Ms. Levy's disappearance in time to the heated phone call, implying Plaintiff had something to do with Ms. Levy's disappearance or that after an angry and heated exchange Plaintiff had something to hide or was withholding information. *See Solano,* 292 F.3d at 1083 (" 'A defendant is liable for what is insinuated as well as for what is stated explicitly.' ") (quoting *O'Connor v. McGraw–Hill,* 159 Cal.App.3d 478, 206 Cal.Rptr. 33 (1984)).

The Second and Third Offending Statements are reasonably susceptible of a defamatory meaning. Defendant's motion to dismiss the Complaint's second and third claims for libel on the ground they allege offending statements not reasonably susceptible of a defamatory meaning is DENIED.

D. *Plaintiff's Objections to the Declaration of David Perel and Exhibits Attached Thereto*

Plaintiff objects to various aspects of the Declaration of David Perel. *See* Doc.31. Plaintiff contends there is no foundation, personal knowledge, or proper grounds for opinion for Mr. Perel's statements regarding the *Enquirer*'s change of focus in the late 1980s and his claim the *Enquirer* has broken several significant national news stories since the late 1980s. *See id.* at p.2; Doc.22 at ¶¶ 4, 11. Mr. Perel states he joined the *Enquirer* in 1985, was appointed

Executive Editor in September 1996, and was appointed Editor in July 2001. *See* Doc.22 at ¶¶ 2–3. He does not state what his duties were (and are) in his various capacities at the *Enquirer,* or even what his capacity was between 1985 and 1996 (except to state that in 1994 and 1995 he was the editor in charge of the *Enquirer* 's coverage of the O.J. Simpson trial for the murder of Nicole Brown Simpson and Ronald Goldman). It cannot be determined whether Mr. Perel's statements in paragraphs 4, 7, and 11 are based on fact or opinion, or what foundation he has for making those assertions. *See* Fed.R. Evid. 701, 702. Plaintiff's objections to paragraphs 4, 7, and 11 of Mr. Perel's declaration are sustained. Since Mr. Perel's capacity as editor at the *Enquirer* working on the O.J. Simpson case, and since 1996 is specified, and he asserts he has personal knowledge of these events, the objections to paragraphs 1–3, 5–6, 8–10, and 12–13 are overruled.

Plaintiff's hearsay objections to the *New York Times* article, Mr. Perel's partisan characterization of it, and other attached articles, have been fully considered. *See* Doc.31 at p.3. Such anecdotal evidence offered to assist the determination of the legal issue whether the *Enquirer* is a newspaper, has been considered. The evidence is not misleading or confusing. It is an opinion, offered among a number of circumstances relevant to making the legal determination on the 48a "newspaper" issue. The objection is overruled.

## V. *CONCLUSION*

Defendant's motion to dismiss or strike, or alternatively, summary judgment and attorney's fees on the ground California's anti-SLAPP suit statute applies is DENIED.

Defendant's motion to dismiss, or alternatively, for summary judgment, on the ground Plaintiff failed to comply with California Civil Code section 48a is DENIED.

Defendant's motion to dismiss the Complaint's first claim for libel on the ground it alleges offending statements not reasonably susceptible to a defamatory meaning is DENIED.

Defendant's motion to dismiss the Complaint's second and third claims for libel on the ground they allege offending statements not reasonably susceptible of a defamatory meaning is DENIED.

Within five (5) days following the date of service of this decision, Plaintiff shall lodge a proposed order in conformity with this decision.

SO ORDERED.